MACKALL et ux. v. OLCOTT et ux.

(Supreme Court, Appellate Division, First Department. April 15, 1904.)

1. TRUST—EVIDENCE TO ESTABLISH—SUFFICIENCY.

In an action by a husband and wife against a husband and wife to declare a trust as to the proceeds of a sale of real property, predicated on the existence of an express agreement binding defendants to take the title by purchase at a judicial sale and hold the equity of redemption in trust for plaintiffs, evidence examined, and *held* insufficient to show an agreement other than to bid off the property and furnish plaintiffs an opportunity to redeem.

2. SAME.

The evidence was also insufficient to establish the existence of such a confidential relation between plaintiffs and defendants as would warrant a declaration of trust ex maleficio by a court of equity, though there was proof of an intimate friendship between the wives which, together with defendants' desire to protect their interest as junior incumbrancers, led to the purchase.

Appeal from Judgment on Report of Referee.

Action by Brooke Mackall and wife against Jacob V. V. Olcott and wife. From an interlocutory judgment directing that defendants account to the plaintiffs for the amount of money received by them on the sale of property that had belonged to plaintiffs (but purchased by defendants at a judicial sale thereof for $72,500, under an alleged trust agreement, and subsequently sold for $97,000), defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, INGRAHAM, and LAUGHLIN, JJ.

J. Hampden Dougherty, for appellants.
Herbert O. Smyth, for respondents.

HATCH, J. This action was brought to establish a trust, and to compel the defendants to account to the plaintiffs. It was shown upon the trial that the plaintiff Brooke Mackall was the owner of certain real property in the city of Washington, D. C. In 1895 he and his wife, Jennie W. Mackall, executed a deed of trust, or mortgage, upon the property, to secure the payment of $65,000, with interest thereon at the rate of 5½ per cent. per annum. Brooke Mackall became ill, and for a considerable period was unable to pay the interest due upon the mortgage. The holder threatened foreclosure, when Mrs. Mackall wrote to Mrs. Laura H. Olcott, the wife of the defendant Olcott herein, who was an intimate friend of Mrs. Mackall, and obtained from her a loan of $5,000, to secure which the plaintiffs gave a second mortgage upon the premises on the 7th day of February, 1898.

The evidence is probably sufficient to establish an agreement between Olcott and the Mackalls that he would bid off the property for Mackall's benefit, to enable him to procure a new loan thereon. This is expressed in the letter written by Olcott, under date of October 25, 1898, to Mackall, as follows:

"I was not able to attend the sale in Washington; but on my behalf, the property was bid in by Mr. Birney, and I made the deposit of $500. Mr. Birney writes me that it takes $70,900 to cover Mr. Harrison, and that the bid that he made on my behalf was $71,000. Of course you appreciate that the only reason why I made this bid was to protect you, and you certainly now have an opportunity to have the additional time that you wished to procure the loan. I, myself, have not any particular belief that it will be so easy as you think, but if you can procure the loan so that Mrs. Olcott will not be under the necessity of raising the amount of cash that is necessary, of course she will be only too glad to assign the bid to you. In fact, had it not been for your letters to her, I think she would have preferred to let her own $5,000 go. Hoping that you will be able to procure this loan, and hoping also that your ideas of the value of this property are not entirely exaggerated, I remain, yours very truly, J. Van Vechten Olcott."

At this point in the negotiations between these parties it is clear that the only protection which Olcott had agreed to furnish to the Mackalls was to bid in the property at the sale, thereby enabling Mackall to procure a new loan and thus protect whatever equity he had in the property. Had the transaction stopped here and Olcott had done nothing more, it is clear that no liability of any kind could attach to him. He had then fulfilled the obligation which he had assumed. He had a further right. He had made a deposit of $500 upon the sale. Mrs.

Olcott's mortgage of $5,000 was unpaid. He, therefore, in the event of a failure of Mackall to furnish the money, in order that compliance might be made with the terms of the sale, could assume that obligation himself, for the purpose of protecting his own interest and the interest of his wife. In such event he would have been under no obligation to have held the property for Mackall's benefit, or to account for anything which he might realize upon a subsequent sale, either public or private. Nor could he have been charged in such transaction with a violation of the obligation which he had assumed, or of offending in any sense either against law or morals. Mackall did not raise the money, either by loan or otherwise, to protect his interest in the property, although he made efforts so to do, and certainly Olcott was under no obligation to act further for him; but he, like Mackall, was unable to make compliance with the terms of the sale, as he had not made preparation for raising the money, nor was he required to pay the amount of his bid as between himself and Mackall. It was Mackall's default in failing to raise the money within the period between the date of the sale and the date when his right to redeem expired. Olcott, not being able to complete his sale, a resale of the property was subsequently had, at which the property was again struck off to Olcott for $72,500. Between the first and second sales, while it appears that Olcott made endeavors to raise the money to comply with the terms of his first bid, and that such endeavor upon his part was communicated to Mackall, yet there is nothing to show that during such negotiations he assumed any other or further obligation to protect Mackall's interest. On the contrary, it clearly appeared that he was then forced into a position where he was required to protect his own and his wife's interest, not through any fault of his, but through the failure of Mackall to comply with the terms of the sale. The only evidence upon this subject is found in a letter written by Mrs. Olcott to Mrs. Mackall, in which she stated, "Never think I will go back on you," and expressing the hope that Mr. Olcott could so arrange matters that a new sale would not be necessary, and the belief that he could speedily sell the same for a considerable amount over all incumbrances upon the property, and that he was doing all in his power for Mrs. Mackall. Mrs. Mackall testified that just before the second sale of the property Mrs. Olcott came to see her, and stated to her that the reason Mr. Olcott did not come with her was that he was remaining in the city to do what he could to protect the Mackalls. Mrs. Mackall also testified that by reason of this letter and these interviews they forebore any attempt to procure bidders to represent them upon the resale. But beyond the assurance that Olcott was trying to prevent a resale of the property by complying with the terms of his bid, and the other matters to which we have called attention, there is nothing upon which could be founded any obligation upon Olcott's part to further protect Mackall's interest, while it is clear that he had the legal right to protect his own, and in so doing he violated no duty which he owed to Mackall. Nor do we find anything between these periods which would justify the finding of an agreement upon his part to further continue to protect the Mackalls in any form. After the resale, Olcott wrote Mrs. Mackall the following letter, under date of December 16, 1898:

"You probably know by this time that I have again bid the property in for $72,500, and have put up a deposit of $2,500 in cash. The title must be passed on the 30th of December. When I bid the last time, I received a number of offers to purchase the property, so that the entire indebtedness on the first and second trust deeds would be paid, and leave some slight balance over; although my counsel in Washington advises me that the title under these sales in a purchaser is absolutely good, you can appreciate that there is no disposition on my part to desire to make any money on any purchase. Will you not write me forthwith, as to the exact amount of money that you would sell the property for, in case it is under your control entirely? In other words, please give the lowest cash figure. I did my utmost pending the time between the last sale and the actual closing of the title, to make arrangements to borrow sufficient to my purchase, but was unable to do so. I certainly do not wish to make another default, but with equal certainty, I do not desire to do anything that you will not approve of."

The rights of these parties are to be determined by the status of the case as made at this point. After the failure of the Mackalls to raise the money necessary to redeem after the first sale, it is clear that Olcott was as free to raise the money and take the property for his own benefit, or permit it to go to a resale and bid it in in like manner, without incurring any more obligation than would any other purchaser. Mackall had notice of every step which was taken, and had all the opportunity to redeem the property after the first sale, or to make any other disposition of it that he was able to, and Olcott became as free to act, after his failure to comply with the terms of his engagement, as though he had never had negotiations with him. The letter which he wrote after the second sale contains no element of any agreement, nor is there recognition of his having made any. On the contrary, he expressly declares it to be his purchase and that he did not desire to make another default, and he notifies Mrs. Mackall that he has no desire to make any money by the transaction, and desired to know what her views were with respect to the lowest cash sum which she would be willing to take if the property was entirely under her control; but as for recognition of any right or interest of Mackall in and to the property, there is not the slightest, nor is there any such recognition of any such right or interest between the date of the notification of the first bid and during the period that Olcott held title to the property. The theory upon which the learned court below decided the case, as expressed in its findings, is that it was the understanding of the parties that the defendants would purchase the property at the foreclosure sale for the benefit of the plaintiffs, and account to them for any surplus that might remain upon a sale of the property beyond the moneys advanced and disbursements necessarily or properly made or incurred, and that out of such understanding and the confidential relations between the parties a trust was created in favor of the latter which imposed an obligation upon the Olcotts to account for the proceeds of the property. We are unable to find support for this finding in the evidence. The letters written by the defendant Olcott, after he had made sale of the property, in which he expressed a willingness to create a trust in favor of Mrs. Mackall of the amount which he had received from a sale of the property over and above the sums necessary to pay his wife's mortgage and reimburse him for expenditures, furnish no evidence upon which to found an agreement that the property was bid in for the protection and benefit of Mackall. It was a voluntary recognition upon his part of

what he had written after the second sale, that he did not desire to make a profit out of the transaction; but it did not create, or tend to create, any primary obligation upon his part to do otherwise than he did. The letters written by the Mackalls after the transaction cannot serve to establish an agreement upon Olcott's part to bid in the property and hold the same for Mackall's protection. They were mere declarations upon their part, made after the transaction, and cannot serve as evidence in support of any agreement, no matter how positively expressed or how often reiterated. All of the correspondence which occurred, before or after title has vested in Olcott, between these parties, does not establish an agreement to bid in and hold the property for the benefit of Mackall. The legal rights can only flow from the status which existed at the time when the transaction took place. That the Mackalls acted upon the assumption that Olcott would protect them, and that all he did was for their benefit, does not suffice to create an obligation, where such obligation did not exist at the time when Olcott bid in this property on the resale. It is impossible to find in all of the correspondence an express or implied agreement upon Olcott's part to bid in this property and hold the same for the benefit of Mackall. The only obligation which is shown to have been assumed by Olcott was to bid in the property at the first sale, in order to give opportunity to Mackall to redeem the property therefrom, and that obligation was discharged. If it be assumed that there was a continuing obligation upon Olcott's part to further protect Mackall's interest upon the second sale, his obligation at that time was not greater than it was at the first sale. When he bid in the property at the second sale, he immediately notified Mackall of the fact and when the right to redeem expired. Mackall, therefore, had notice of all the facts, and he then became obligated to raise the money and comply with the terms of the sale in like manner as he was upon the first sale. He did nothing, and thus Olcott was forced, for his own protection, to take title to the property. So that in either event, whether it be held that Olcott's obligation ended with the first sale or continued to the second, it was the same obligation, and Olcott fully met it. It was Mackall's failure to raise the money at each time which produced the subsequent results, but as to that there never was any obligation upon Olcott's part to protect Mackall to that extent. It is not claimed, nor has the court found, that in anything which Olcott did he perpetrated a fraud. Neither in the complaint, proof, nor the findings of the court is it claimed or suggested that Mr. Olcott perpetrated a fraud or was guilty of fraudulent conduct in any of the transactions which led up to or which existed at the time when title to the property became vested in him. The complaint proceeds upon the theory of an express agreement to take title to the property and hold the equity of redemption therein in trust for the plaintiffs.

As already suggested, the court was unable to find any express agreement; consequently the judgment cannot be sustained upon the theory of the complaint. In order to reach the conclusion which it did, the court was forced to find an implied understanding; but this implied understanding, as we have already seen, did not embrace any undertaking upon the part of Olcott to bid in the property, raise the money to

pay the amount of the bid, and then hold it for Mackall's benefit. The only agreement which Olcott undertook to do, and which he discharged, was to bid in the property upon the sale. It is clear, therefore, that so far as the judgment is based upon any agreement, either express or implied, it cannot be sustained. The facts warranted no such finding, and no trust was created under such circumstances. Wheeler v. Reynolds, 66 N. Y. 227. To meet this condition, the court went a step farther and found that the defendants occupied towards the plaintiffs a confidential relation, and under the authorities they became trustees of the plaintiffs, and upon a combination of these findings the judgment is sought to be supported. To sustain this view there must have been fraud, either actual or constructive, or there must have been an unconscionable breach of duty. Of actual fraud there was none nor are we able to see that there was constructive fraud or breach of duty. In Kellum v. Smith, 33 Pa. 158, it was said:

"Where the purchaser at a sheriff's sale promises to hold for the debtor, and afterwards refuses to comply with his engagement, the fraud, if any, is not at the sale, not in the promise, but in its subsequent breach. That is too late. It is abundantly settled that equity will not decree such purchaser to be a trustee, unless there is something more in the transaction than the mere violation of a parol engagement."

This doctrine was approved in Wheeler v. Reynolds (supra), and such undoubtedly is the law. The case narrows itself, therefore, to the single question whether there was such a confidential relation existing between these parties that it may be laid hold of for the purpose of creating a trust ex maleficio for the benefit of the plaintiffs. It was stated by Judge Andrews, in Wood v. Rabe, 96 N. Y. 414, 48 Am. Rep. 640:

"There are two principles upon which a court of equity acts in exercising its remedial jurisdiction. * * * One is that it will not permit the statute of frauds to be used as an instrument of fraud, and the other that when a person, through the influence of a confidential relation, acquires title to property, or obtains an advantage which he cannot conscientiously retain, the court, to prevent the abuse of confidence, will grant relief."

Upon this principle that case was decided, as was also the case of Ryan v. Dox, 34 N. Y. 307, 90 Am. Dec. 696, and upon these cases and others, which do not add to their force, the respondent now relies to support the judgment. The difficulty is that the facts which had been made in this case do not fit the principle. The confidential relation existing between these parties had its inception in the friendship between Mrs. Olcott and Mrs. Mackall, and it is evident that the Olcotts were desirous to do anything within reason to assist the Mackalls in their distress, but the confidential relation only prompted Mr. Olcott to undertake to bid in the property and furnish Mackall an opportunity to redeem. There is not a statement, either oral or written, prior to the time when Olcott took title to the property, which shows, or tends to show, that it was ever contemplated by any of the parties that Olcott should bid in this property at the sale, furnish all of the money to complete the purchase, and hold the same in trust for Mackall's benefit. No such obligation arose from any confidential relation existing between these parties, and certainly it was not found in any agreement. If the relations are to be laid hold of to charge Olcott as a trustee ex

maleficio, it would compel us to announce that Olcott could not purchase the property, or complete his purchase in order to protect the interest which he then held, or that of his wife, without imposing upon him in so doing the obligation of a trustee for the benefit of Mackall. The defendant, certainly, could not be deprived of the right of protecting his own property interests save only under penalty of committing a constructive fraud. In protecting those interests we see no reason why he did not have the same standing as did any other purchaser at the second sale. It was no fault of Olcott that Mackall was unable to raise money. He had opportunity so to do and failed, and Olcott was in no wise responsible for such failure. Olcott having fulfilled the only obligation which he ever assumed, and Mackall having made default in availing himself of the opportunity thus afforded him, we think that there was no confidential relation existing between these parties sufficient to bind Olcott to further efforts in behalf of Mackall, and that he then became free to protect the interests which he and his wife had in the property, bid the same in, and complete the purchase, without violating either law or morals, and that thereby he became vested with the title, free of any claim thereon by Mackall.

This leads us to the conclusion that the judgment should be reversed and a new trial granted, with costs to the appellants to abide the event. All concur.