(43 App. Div. 10.)

### CARR v. NATIONAL BANK & LOAN CO. OF WATERTOWN.

(Supreme Court, Appellate Division, Fourth Department. July 18, 1899.)

1. BANKS—MISREPRESENTATIONS BY PRESIDENT—LIABILITY OF BANK.
    Where the managing officer and principal stockholder of a bank, while acting in a fiduciary capacity for its customer, by means of concealment and false representations induces the latter to invest in bonds bought and held by the bank for speculative purposes, the customer may rescind the transaction, and recover from the bank the money it received therefrom.

2. SAME—EFFECT OF ACTS ULTRA VIRES.
    Where a bank has received the proceeds of a sale of bonds held by it for speculative purposes, effected by means of fraud on the part of its managing officer, it cannot avoid liability for his fraud on the purchaser on the ground that its business of buying and selling bonds was ultra vires.

Appeal from special term, Jefferson county.

Action by Lillian Traver Carr against the National Bank & Loan Company of Watertown. From a judgment for plaintiff (52 N. Y. Supp. 61), defendant appeals. Affirmed.

Argued before HARDIN, P. J., and ADAMS, SPRING, and NASH, JJ.

John Lansing, for appellant.
Elon R. Brown, for respondent.

SPRING, J.   By the sudden death of her husband in October, 1892, the plaintiff came into possession of $14,000, the avails of insurance policies on his life.   She was apparently inexperienced in business.   George H. Sherman was then the president of defendant, and the owner of one-half of its capital stock, and a man of business training.   He was an intimate of the family of the plaintiff, well acquainted with her husband, and in the argument of counsel it was stated he was an officer in the church of which her husband was the rector at the time of his death.   On the day before the burial of her husband, her cousin, Mr. Lewis, of Rhinebeck, Dutchess county, in this state, came to Watertown to attend the funeral services with her.   While in the city, he met Mr. Sherman, and took a ride with him at the invitation of the latter.   Mr. Sherman stated it was very important that the moneys to be paid on the life policies to plaintiff should be well invested.   Mr. Lewis deprecated being called upon to assist in this investment, saying he could not get anything desirable at more than 5 per centum, and even then at a premium.   Mr. Sherman replied: "Oh! that won't answer at all.   I can furnish her with the very best securities that will bring her six per centum at par."   When Mr. Lewis expressed surprise at this, Mr. Sherman reiterated his statement.   This conversation Mr. Lewis repeated to the plaintiff.   Afterwards, in a talk with Mr. Sherman, he asked her what kind of security she wished.   She said she knew nothing about securities, but would leave that matter entirely to him, only she "didn't wish to put all my eggs in one basket."   He promised to look up something for her.   November 14th she received the $5,000 on one of the policies, and placed it in the bank; and between that time and February 13th following the full $14,000 were paid to her, and deposited with the defendant.   After the $5,000 came, Mr. Sherman gave to her four bonds of $1,000 each of the Lincoln Light & Power Company, bearing interest at 6 per centum per annum, and payable semiannually.   At the time these bonds were handed to the plaintiff, she asked him if they were first mortgage bonds, and he stated "they are first mortgage bonds, first-class securities, as good as gold," and that he had gotten them expressly for her.   Afterwards he let her have four $1,000 bonds of the Westchester County Waterworks Company, and also three of like kind of the denomination of $500 each, and which were all known as "first consolidated, gold mortgage bonds"; one bond of $500, of the same designation, of the Baraboo Waterworks Company; and four of the Washington Waterworks Company of $500 each.   These bonds aggregated $12,000.   All bore interest at 6 per centum per annum, payable semiannually, and were issued by foreign corporations, except those of Westchester county.   These bonds were not examined by plaintiff.   She was not familiar with their character or value, and relied implicitly upon Mr. Sherman to secure for her first-class securities, and accepted them in the undoubted belief they were of that class.   They were placed in a box furnished by Mr. Sherman, and left in the vault

of the defendant. During the progress of these investments the plaintiff inquired of Mr. Sherman, if she or her cousin found any securities more desirable that those he was procuring for her, if she could get the money on these. He replied to her: "Mrs. Carr, these bonds are as good as gold. I will turn them into cash for you at any time." When the Westchester county bonds were delivered to her, she inquired if they were first mortgage bonds. "He had a pencil in his hand, and he tapped on them, and guarantied to me that those were first mortgage bonds, and that they were especially good as being in the empire state, and to hold on to them by all means. This talk all occurred in the bank." The money used in payment of these bonds, with one exception, was obtained on checks against plaintiff's account with defendant, made and signed by Sherman. It developed that the securities were not of the gilt-edged class represented by Sherman. The Lincoln bonds, even in the easy times of 1892, were not valued above from 50 to 60 cents on a dollar. The company was struggling along under a heavy bonded indebtedness. The Westchester county-bonds were second mortgage bonds, as they were subject to a prior lien of $100,000. And the Baraboo bonds were in the same category. All of these bonds were issued by companies in which a firm known as Moffett, Hodgkins & Clark Company was interested, or had organized, as they had been in charge of establishing the water systems in these various localities. Many of these bonds had been by that firm put up in banks throughout the country as collateral security for notes made by it; and the Washington Waterworks bonds, transferred to the plaintiff, were held by the defendant at that time to secure a promissory note it owned, made by that firm, and the moneys received from the plaintiff were applied towards its payment. As matters have turned out, all of these securities are way below par in value, and were kiting and uncertain and dependent upon the inflation of booming days for their negotiation. As they all bore interest at 6 per cent., payable semiannually, if well secured, in the year 1892, when money was seeking such investments, they would have readily sold above par. The fact they were hawked about, and discounted among Eastern capitalists ought to have apprised these men, skilled in financial transactions, that they were not the most desirable of securities.

The facts further demonstrate that Sherman was not acting as the disinterested friend of the plaintiff. These bonds were all owned by the defendant. The cashier of the bank had made a personal examination of these several Western towns, where the bonds had their origin. This investigation had been made at the instigation and expense of the Moffett, Hodgkins & Clark Company. The bonds had been purchased at a discount of 5 per cent., and unloaded on their customers and purchasers, wherever they could be found, at par. Not that the bank intended to perpetrate any fraud; not that its officers did not believe these securities would be met as they respectively matured; but the rub of the controversy here is, they did not fill the measure of the representations made by Sherman to the plaintiff. They were not the kind of property she was led to believe she was receiving from her magnanimous friend, who had volun-

teered to procure for her first-class securities. Mr. Sherman placed himself in a dubious position. As president, manager, and chief owner of the stock of defendant, it was his duty to dispose of these bonds at the best prices obtainable. This obligation was incompatible with his self-assumed relation to the plaintiff. For her he must manfully discard his official position, his duty to his fellow stockholders, and turn over to this woman, who was relying upon his integrity, his business ability and ripe experience, securities which were "gilt-edged, as good as gold." Like many a worse man, he proved unequal to the emergency. To annul the transactions, the result of this double relation, it is not necessary to establish that Mr. Sherman intended to perpetrate a fraud upon the plaintiff. Munson v. Railroad Co., 103 N. Y. 58, 8 N. E. 355; Smith v. Railway Co., 72 Hun, 202–208, 25 N. Y. Supp. 368; Conkey v. Bond, 36 N. Y. 427. As was said in the case first cited:

"But we are of the opinion that the contract of September 14, 1875, is repugnant to the great rule of law which invalidates all contracts made by a trustee or fiduciary, in which he is personally interested, at the election of the party he represents. There is no controversy as to the facts bringing the case, as to Munson, within the operation of the rule. * * * He stood in the attitude of selling as owner and purchasing as trustee. The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case."

Had Sherman made no statement whatever as to the character of these bonds, a suit for the rescission of the transaction would lie. He was acting in a fiduciary capacity for the plaintiff. It was his duty to explain to her in the clearest, most ingenuous manner that these bonds had been purchased and were sold by his bank; that they had been procured at a discount; that they were second mortgage bonds, and were held for speculative purposes. The bare suppression of these facts was tantamount to proof of actual fraud, so far as implicating him in a legal liability to her is concerned. Hammond v. Pennock, 61 N. Y. 145. There was a default in the payment of the interest on the Baraboo bonds in June, 1894, and thereafter the interest on some of the other bonds was not paid by the obligors as it matured from time to time. The defendant paid this defaulted interest as it accrued until October, 1896. After the default occurred, the plaintiff undertook to have Mr. Sherman take back the bonds, and repay her, as he had promised. This agreement he repudiated. The bonds then were not negotiable, unless at a great sacrifice, as the fictitious value imparted to them had disappeared. It was not until August, 1896, that the plaintiff learned these bonds had been purchased by defendant, and were owned by it, at the time of the respective transfers to her, and that her supposed agent was in fact disposing of securities held by defendant, and obtained for the purpose of speculation. She then tendered back what she had received, demanded her money, and sought to rescind the transaction. Mr. Sherman has died since the commencement of the action, but the salient facts which rendered the defendant liable

are undisputed, and arise mainly from his relation to the parties, and the character of the securities transferred to the plaintiff under the guise of first mortgage bonds. While the evidence is undisputed that the bank was the owner of these bonds, and expected to sell them, and was, therefore, an undisclosed principal, it is contended that the transaction was with Mr. Sherman as an individual, and not as a representative of the bank. He had no interest in the bonds, except as one of the owners of the capital stock of the defendant. The bank had these bonds for sale. It received the avails of these transfers. It knew Sherman had disposed of the bonds, and to whom. It received the fruits of his agency, and must accept also the burden imposed by that relation. Fairchild v. McMahon, 139 N. Y. 290, 34 N. E. 779; Reynolds v. Leyden (Sup.) 57 N. Y. Supp. 210.

It is further urged on behalf of the bank that the statements made by Sherman to the plaintiff which induced the acceptance of the bonds was simply the expression of an opinion of their value. He stated they were first mortgage bonds. The vice of that statement was its falsity as to the character of the securities. Their value depended very materially upon the truthfulness of that representation. It was of much force in controlling her action. It was more than a naked statement as to the value. Fairchild v. McMahon, 139 N. Y. 290, 34 N. E. 779; Harlow v. La Brum, 82 Hun, 292, 31 N. Y. Supp. 487. But, as we have stated, the nature of the transaction carries its own condemnation irrespective of any declaration.

The point is pressed that the buying and selling of bonds are not within the compass of the powers of the bank, and it cannot be made responsible for the excessive exercise of its powers by its officers; that is, a corporation, acting solely through officers, receives the fruits of the business engagement made by its chief functionary, knowing he is acting in its behalf, clothing him with authority to consummate the specific act complained of, and yet, when a rescission is sought because of his fraud, the bank can screen itself behind the want of power in it to make the deal. The bank purchased the bonds, not for an investment, but to sell at a profit. It advertised broadcast it held them for sale. There was no pretense then of the lack of authority, although every stockholder must have been aware of the business carried on, for publicity was given to the fact by the bank itself that it held these bonds for disposal. The doctrine of ultra vires cannot be resorted to to shield the defendant after its action in these transactions has been so open and notorious. Burden v. Burden, 159 N. Y. 287, 304, 54 N. E. 17; Kent v. Mining Co., 78 N. Y. 159, 184. The bank has been the recipient of all the benefits resulting from these sales, and, if its officials have been guilty of misconduct, it was while they were pursuing the business of the defendant. It would be inequitable to hold now that the bank is not responsible for whatever its president did under its commission.

The judgment is affirmed, with costs to the respondent. All concur.