M. L. STEWART & Co., INC., and Another, Plaintiffs, *v.* BERNARD K. MARCUS and Others, Defendants.

Supreme Court, New York Special Term, December 8, 1924.

**Trusts — action to impose trust on real property — defendant made offer to buy real property — offer was rejected — plaintiff, depositor in defendant's bank, made offer for same property and negotiations were carried on but not successfully — before negotiations with plaintiff were closed defendant made new offer — plaintiff informed defendant, after defendant's second offer, that it had purchased property — defendant learned that plaintiff had not purchased property and made new offer which was accepted — defendant did not wrongfully interfere with any contract between plaintiff and vendor — defendant is not chargeable with violating trust or confidence — plaintiff is not entitled to judgment.**

In an action to impose a trust on real property on the ground that defendant purchased the property in violation of a trust or confidence imposed in it by the plaintiff which was negotiating for the same property but which had not entered into an enforcible contract for the purchase of the same, the defendant is not liable on the theory that it wrongfully interfered with a contract between the plaintiff and the owner of the property, since at the time of the alleged illegal interference the plaintiff did not have an enforcible contract with the owner.

A trust will not be imposed on the property in question in favor of the plaintiff on the theory that the defendant purchased the property in violation of a trust and confidence imposed in it by the plaintiff, since the evidence shows that defendant made an offer for the property and before that offer was rejected the plaintiff made an offer; that the plaintiff was a depositor in the defendant's bank at the time the offers were made; that the plaintiff carried on negotiations with the owner of the property but said negotiations had not terminated successfully in favor of the plaintiff when the defendant made a new offer for the property; that both the defendant and the plaintiff were ignorant of the offer that each had made; that prior to the purchase of the property by the defendant, plaintiff told the defendant that it had purchased the property and that while it had made arrangements for loans to enable it to purchase the property it would require an additional loan to enlarge its business and the defendant assured the plaintiff that a loan could be arranged; and that immediately thereafter the defendant learned that the plaintiff had not purchased the property but was merely negotiating for its purchase and the defendant made a new offer which was accepted after the plaintiff's offer had been rejected.

ACTION to charge a trust upon certain property and to direct a conveyance thereof to plaintiff.

*Guggenheimer, Untermyer & Marshall* [*Louis Marshall* and *James Marshall* of counsel], for the plaintiffs.

*Guthrie, Jerome, Rand & Kresel* [*William D. Guthrie, Isidor J. Kresel* and *Bernard Hershkoff* of counsel], for the defendants.

BIJUR, J.:

This action is brought to charge a trust upon, and direct a conveyance of, certain property in favor of and to plaintiff upon the following state of facts: Plaintiff, M. L. Stewart & Co., Inc., had prior to September, 1923, been a depositor in the Bank of the United States, of which defendant Marcus was vice-president. Another corporation, The Russek Company, was also a depositor in the bank. As early as May, 1923, the Russeks learned that the property at the corner of Fifth avenue and Thirty-seventh street, known as the Gorham store, was for sale and made an offer for its purchase. In September, the Russeks and Marcus had a conference in which Marcus was instructed to negotiate for the purchase of the property, and an arrangement was made for possible participation by, and a lease to, them in case of such purchase. On September twenty-eighth Marcus made his first offer of $1,500,000. On October first the Stewarts made their first offer of $1,550,000, which was $50,000 less than the owners, represented by a Mr. Fuller, had intimated to be the sale price. Fuller was sufficiently impressed with the Stewart offer to suggest that the attorneys of the parties meet and endeavor to draw up a formal agreement. He also, on October second, in response to the Stewarts' request, accorded them a " gentlemen's agreement " that during the continuance of negotiations with them no other offers would be considered. By October ninth or tenth the negotiations between counsel had reached a point of serious disagreement as to the requirement by Fuller that the down payment of $200,000 be turned over to the vendor directly, whereas plaintiff insisted, in accordance with the terms of its offer, that it be placed in some form of escrow. There were also at that time some other differences which had failed of satisfactory adjustment. On October fourth or fifth Marcus' offer was rejected. On October ninth he had an interview with Fuller, at which he was informed that there were negotiations pending with other persons and that if those were broken off Fuller would be glad to consider an offer from him, which would have to be more than $1,600,000. Thereafter Marcus had a talk with his own real estate broker and the vendor's broker, at which the latter advised him to put in a bid of $1,630,000. On October tenth Marcus made a written offer of $1,600,000. On the same day, at five P. M., Fuller left town and did not return until the fifteenth. On the latter date, about two P. M., Isaac Liberman, plaintiff's treasurer, who was the active man in the negotiations, met Marcus casually on the street, walked with him to the Gorham store, to which Marcus was going, and during this visit informed Marcus that plaintiff had purchased the property.

The details of the further conversation between them are in dispute. Both agree that Liberman made an application for a loan, which he said, or intimated, would be needed to carry on the more extensive business which they expected to do in this larger building, and Marcus agreed that the bank would make such a loan to the extent of $250,000, which was the bank's legal limit.

Liberman testified: " I said: ' You know, Mr. Marcus, we purchased the Gorham leaseholds,' and he said: ' Is that so? ' I said, ' Yes.' I then said: ' I was coming around to see you. You know this is quite a large proposition and we would require some help from our bankers.' He said: ' That is all right, you can depend upon us for all the law will permit us to give you.' * * * He then said to me: 'Are you paying more than a million and a half for the Gorham leaseholds? ' And I said: ' Thereabouts.' "

They then walked to the bank, a few blocks down Fifth avenue, and in Marcus' office Liberman said: " ' Now we can absolutely depend upon you for a loan, Mr. Marcus? ' And he said: ' You can depend upon us for anything you want,' and he then said to me: ' Is there anything I can do for you to help you? ' And I said: ' No, thank you, there isn't a thing. We have got everything arranged, a loan and everything else is arranged.' "

After Liberman had left the bank Marcus telephoned to his broker that the building had been bought by the Stewart Company. The broker replied: " You are crazy * * * I will investigate and let you know." After the lapse of some minutes he informed Marcus that the property had not been sold. Shortly thereafter Fuller telephoned Marcus to call at the former's office, which Marcus did. At this interview Fuller, in response to Marcus' narration of Liberman's statement, informed him that the property had not been purchased by any one. Thereupon Marcus made the offer suggested by Fuller of $1,625,000, which was accepted. Subsequently a contract of sale was executed. In the meantime Fuller's attorney had telephoned plaintiff's attorney formally terminating their negotiations and asking for a return of the papers. A day or two later Liberman learned that Marcus had purchased the property and subsequently this action was brought.

Plaintiff's claim is, as I understand it, twofold: *First,* that defendants are liable on the doctrine of *Rice* v. *Manley* (66 N. Y. 82) for procuring the vendor to break its agreement with plaintiff; *second,* that as a result of the interview of October fifteenth, Marcus occupied a fiduciary relation toward plaintiff which entitles it to avail of the former's purchase.

As to the plaintiff's first contention: I am convinced, from both the words and conduct of the plaintiff and the vendor, that

they were fully aware that no contract had been made between them. Moreover, even had an oral agreement been reached, it would have been unenforcible under the Statute of Frauds, and the case is barren of the factor stressed in the *Rice* case, *i. e.*, that the vendor was willing to perform the agreement; indeed, the evidence is to the contrary. Moreover, in view of the fact that Marcus had been a prior bidder for this property without any knowledge that plaintiff was a competitor, and that he was told by Fuller, a reputable banker, that no contract had been made with plaint*ff, it cannot be said that his purchase was " without reasonable justification or excuse," an element which is decided by the leading cases on this subject to be essential to such a cause of action. (*Campbell* v. *Gates*, 236 N. Y. 457, 460; *Lamb* v. *Cheney & Son*, 227 id. 418, 422; *Posner Co.* v. *Jackson*, 223 id. 325, 332; *American Foundries* v. *Tri-City Council*, 257 U. S. 184, 210, 211. See, also, " Inducing Breach of Contract," by Francis Bowes Sayre, 36 Harv. Law R. 663.) This is perhaps only another way of saying that he was not the inducing cause of the breach of contract, if one existed. (*Sweeney* v. *Smith*, 171 Fed. 645.)

The second basis suggested by plaintiff for its cause of action requires more extended consideration. It is expressed in its counsel's brief in the following words: " These indisputable facts are sufficient to establish such a relation of trust and confidence between the plaintiff and Marcus as to subject him to the application of the principle governing the duties of fiduciaries and impressing a constructive trust upon property acquired by a fiduciary in violation of such duty."

It is, of course, clear that a trust or a fiduciary relation in its strict sense, namely, a relation in which one person is constituted a trustee and the other a *cestui que trust* is created only by mutual consent, express or implied. On the other hand, as formulated by Pomeroy in his " Equity Jurisprudence," section 1044 (quoted by plaintiff's counsel): " Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust."

To the same effect is the definition of Judge CARDOZO in *Beatty* v. *Guggenheim Exploration Co.* (225 N. Y. 380, 386): "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good con-

science retain the beneficial interest, equity converts him into a trustee."

Cases, therefore, which deal with the obligation of a trustee, agent, factor, guardian, attorney, partner and the like are not relevant to the present controversy. The same is true of those which like *Trice* v. *Comstock* (121 Fed. 620), so far as material to the present case, merely enlarge the limits, whether of time or interest, to which the courts will extend the obligations of a real trustee or agent. The importance of recognizing the distinction at the outset lies in this, that if Marcus had been plaintiff's actual agent or trustee in or for the purchase of the property, neither the fact that he had been a prior bidder nor that the information given to him by plaintiff was inaccurate would affect his obligation to hold this property for the benefit of plaintiff.

In the discussion of constructive trusts it is quite common to quote the language of Lord CHELMSFORD in *Tate* v. *Williamson* (L. R. 2 Ch. 55, 60): "The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one and the influence which naturally grows out of that confidence is possessed by the other and this confidence is abused or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed."

Many of the cases which cite this or similar language will be found to turn, nevertheless, on the existence of an actual agency or trusteeship, such for example as *Butler* v. *Prentiss* (158 N. Y. 49), which was a controversy between partners; *Carr* v. *Nat. Bank & Loan Co.* (43 App. Div. 10; affd., 167 N. Y. 375), where GRAY, J., pointed out that the defendant's president "undertook to act as the agent of both parties." Indeed, in the *Tate* case itself Lord CHELMSFORD solicitously refers to the fact that the defendant had authority which involved a dealing with the property of the plaintiff's intestate, and placed himself in a relation of confidence "by his undertaking the office of arranging the intestate's debts." The passage quoted, however, is particularly valuable for its indication that it is not the nominal but the actual relation of the parties

which must be examined in order to determine whether there has been a breach of trust.   The fact that the parties may have been long-standing friends or neighbors (which is adverted to by some of the text writers), may be one of the  elements to be weighed, but in its last analysis the test is the reposing of confidence — in the sense of trust — and its abuse, which must determine the result.   Illustrations of cases in which the defendant has been held to be a constructive trustee are *Ingersoll* v. *Weld* (103 App. Div. 554); *Trezevant & Cochran* v. *Powell & Co.* (130 S. W. 234, Tex. Civ. App.); *Crosby* v. *Clark* (132 Cal. 1); *Wakeman* v. *Dodd* (27 N. J. Eq. 564), and *Smith* v. *Kay* (7 H. L. Cas. 750).   Among those in which the contrary conclusion has been reached will be found *Pickler* v. *Pickler* (180 Ill. 168); *Mackall* v. *Olcott* (93 App. Div. 282; affd., 183 N. Y. 580); *Peppard Realty Co.* v. *Emdon* (204 App. Div. 8); *Collins* v. *Sullivan* (135 Mass. 461); *Hamilton* v. *Toner* (17 Ind. App. 389); *Colonial Trust Co.* v. *Hoffstot* (219 Penn. St. 497).   Our own Court of Appeals has in a number of instances found it expedient to stress the existence of the family tie as an important factor in its decisions (*Ryan* v. *Dox*, 34 N. Y. 307; *Wood* v. *Rabe*, 96 id. 414; *Goldsmith* v. *Goldsmith*, 145 id. 313; *Sinclair* v. *Purdy*, 235 id. 245; *Leary* v. *Corvin*, 181 id. 222), but that was far from being the sole consideration.   In *Wood* v. *Rabe* (*supra*, 426), commenting on a situation where the " trust " undertaken by defendant was unenforcible because merely oral, ANDREWS, J., said: " It is true that the fraud upon which the court acts in such cases must be something more than that which in a moral sense arises from a mere breach of an oral agreement.   * * *  The trust sought to be enforced in this case does not arise exclusively from the agreement, but from the agreement in connection with the other circumstances, the interest of the plaintiff in the land, the confidential relation of the parties, the youth and inexperience of the plaintiff, the fact that he acted without independent advice, and the injustice which would result in case the agreement should not be enforced."

In short, it is impossible to define the ground of the intervention of the court more closely perhaps than to say that it is called for whenever the transaction is condemned by the wholesome moral sense, the *mores*, of the community.   This *mores*, frequently spoken of as " custom," must be distinguished from that sort of custom or usage which means no more than a *practice* of the community which courts will, unless it be expressly excluded, consider incorporated into every contract made in the locality where it prevails.   (Custom in the Common Law, by F. A. Greer, 9 L. Q. R. 153.)   It is equally difficult to formulate an accurate distinct on between a legal and moral fraud.   It suffices for my

Supreme Court, December, 1924.      [Vol. 124

purpose to realize that generally speaking the courts endeavor, wherever it can be done without too radical a departure from recognized legal rules, to harmonize the necessities of a competitive industrial system of business with the teachings of morality. It is not easy to reconcile the doctrine of *caveat emptor* or, indeed, the very notion o a " good bargain " with the sense of universal justice exemplified in the Golden Rule. But courts of justice are making a gradual advance toward enforcing the requirements of what, in default of a more precise designation, we may perhaps term sound business ethics.

In the endeavor to point out the " fiduciary relation " of Marcus plaintiff's counsel has emphasized the fact that his client was a depositor in the bank.

Defendant contends that under well-known authorities that relation is one merely of debtor and creditor. Plaintiff urges that it is of a particularly confidential nature l ke that existing between attorney and client and that for betrayal of the depositor's confidence the bank may be held as a constructive trustee. Both arguments are, I think, beside the mark, because the present controversy arises not out of the mere relation of depositor and bank, but out of the further facts connected with the application for a loan on October fifteenth. Plaintiff cites as an illustration the recent case of *Tournier* v. *Nat. Provincial & Union Bank of England* (L. R. [1924] 1 K. B. Div. 461), in which the Court of Appeal sustained plaintiff's claim of the existence of an implied agreement on the part of a bank to keep its depositors' affairs secret, but coupled it with serious qualifications. Because of these the decision has been criticised as almost futile. (See 40 L. Q. R. 278, Ju y, 1924.) But whatever its merit it has only a remote bearing on the present controversy. In the course of his summation before me plaintiff's counsel said with commendable clarity and frankness: " I have not argued that Mr. Marcus had no right prior to the 15th of October, when he was under no fiduciary obligation to Stewart & Co., to negotiate for this property or to try to buy it. He had a perfect right to do so."

The fact that plaintiff was a depositor in Marcus' bank is merely incidental and significant in the present case only of the consideration that the borrower did not come uninvited to the lender. Of course, no man can obtrude either his trust or his secrets upon another to the extent of imposing upon that other any obligation in regard thereto, any more than he can render another his bailee *in invitum*. In that respect banks present a constant invitation to intending borrowers and thus subject themselves to whatever implication or obligation is to be drawn from that fact. In my

opinion, however, the case would not be any different if the proposal were made to a private money lender or even to an intimate friend, provided always that the application came to the lender at his invitation, express or implied, or with his equivalent consent.

Moreover, I assume that if a person applies for a loan and in connect on with that application discloses his purpose to avail of a bargain which he had not as yet closed by contract and of which the lender had not previously heard, the courts, whether of law or equity, would afford some form of adequate relief in case the applicant was forestalled in his project by the lender.   The case before me, however, presents the important distinguishing characteristic that the banker was already, and concededly rightfully, in negotiation for the same property on behalf of another depositor toward whom he owed the duty of a contractual trustee or agent.   Had Liberman, therefore, on October fifteenth told Marcus that he was negotiating for the purchase of the property I should be sorely puzzled to determine the nature and extent of Marcus' constructive duty to Liberman consistent with his actual contractual duty to the Russeks.   " Most rights are qualified.   *   *   *   The interests of business also are recognized as rights, protected against injury to a greater or less extent, and in case of conflict between the claims of business on the one side and of third persons on the other, lines have to be drawn that limit both."   (From the opinion of Mr. Justice HOLMES in *American Bank & Trust Co.* v. *Federal Bank*, 256 U. S. 350, 358.)   That problem, however, need not be solved here because I am convinced that a just interpretation of the events of October fifteenth demonstrates that no confidence was reposed by Liberman and no abuse thereof practiced by Marcus.

The essence of plaintiff's claim, reduced to its final terms, is that at the interview of October fifteenth Liberman made Marcus the repository of his confidence by communicating to him, in connection with the application for a loan, certain information of which Marcus took unfair and unwarranted advantage to plaintiff's injury and to Marcus' profit.   In analyzing the facts, therefore, it becomes necessary to determine what information was communicated by Liberman, whether it was communicated in confidence, and, finally, whether Marcus took advantage of it, undue or otherwise.   Had Liberman told Marcus that he was negotiating for the purchase of this property it might be argued that such information could prove of value to Marcus, though even in that case it is evident that Marcus was already aware not only that there were competitors, but that one of them was regarded by the vendor as so serious a bidder that the vendor was unwilling even to consider Marcus' bid pending the negotiations with the third party.   Similarly,

had Liberman informed Marcus of the amount of his offer it might, at least under some circumstances, have been of concrete assistance to Marcus in formulating his own future offers. But Liberman did not tell, or undertake to tell, the amount of his bid. On the contrary, according to his own story, when he was asked whether he was paying more than $1,500,000, he said " thereabouts."

Passing all this, however, and coming to what I consider the determinative consideration, Liberman did not say that he was negotiating for the purchase of the property, but that he had bought it, and he repeatedly emphasized the fact that all his financial arrangements with other bankers to carry out the purchase had been successfully concluded. Both of these statements were untrue. By this I do not mean to impute to Liberman a deliberate intent to deceive. But plaintiff's claim depends upon the communication of valuable information in confidence; the inference seems to me to be irresistible that since the information was wholly incorrect to Liberman's knowledge he considered it of so little importance that he was indifferent to its accuracy or, in other words, that he could not have regarded it as a confidence at all in the sense in which it is now urged by him. Moreover, the fact which he stated, namely, that he had bought the building, was in its very nature not one which any person would ordinarily regard as a " confidence" nor as information which could be made the subject of abuse. Having been thus told that plaintiff had purchased the property, no consideration of law or morals required Marcus to inform Liberman that he had been an unsuccessful bidder, and by the same token his obligation to the Russeks would appear to him to have come to an end. Whether, therefore, he told Liberman of his prior bid or not depended wholly upon his personal whim at the moment. He testified that he did; Liberman denied it. I regard it as immaterial either way.

Plaintiff has commented at some length upon the haste and apparent eagerness with which Marcus proceeded during the hours succeeding his receipt of this " information " from Liberman. The criticism seems to me to be unwarranted. It is to be remembered that Stewart's bid under the negotiations up to October tenth had been $1,550,000, coupled with a number of conditions, and that a new requirement imposed by plaintiff in relation to the down payment of $200,000 had resulted in a practical disagreement. At that very time Marcus, knowing nothing of the other negotiations, submitted an unconditional offer of $1,600,000 upon terms which had already theretofore been declared by the vendor to be satisfactory. By a strange coincidence Fuller, representative of the vendor, left New York on October tenth and did

not return until the fifteenth. Now, without regard to the testimony which uncontradictedly confirms that view, it must be evident to every business man that when Marcus' bid was received on October tenth its natural result was to put an end to the negotiations with plaintiff, and that only Fuller's absence between October tenth and fifteenth delayed the communication of that result from the earlier to the later date. It was mere chance that Liberman's interview with Marcus and the activity of Fuller coincided in point of time. Whether, however, Fuller's telephone call to Marcus originated in Fuller's own impulse or was stimulated by some indirect communication from Marcus' broker is wholly indifferent. It was the natural, indeed the inevitable, consequence of a situation which had developed independently of Marcus' later intervention. In my view of the transaction as it took place it would be unwarranted to say that Marcus' purchase of the property was the result of Liberman's information. On the contrary, from the judicial point of view, I think it is far more accurate to say that it took place in spite of Liberman's misinformation.

The fact that Marcus bought this property shortly after the interview with Liberman was merely accidental and in no true sense due to what Liberman had said. Moreover, a judgment in plaintiff's favor would have to be based on the rather paradoxical proposition that one who makes a misstatement to another is entitled to equitable relief on the theory of a constructive trust arising from the actions of that other when he discovers the truth.

This case involves questions altogether novel, both in fact and principle. In reaching my conclusion I have found it necessary to examine and discard many theories and considerations which at first appeared to be applicable. I have not attempted to review all the details of fact nor certain propositions of law which have only a remote bearing on the decision. Nor have I adverted to a few technical points that have been suggested. I have confined my discussion to those matters which I deem material to and determinative of the merits, and have based my conclusion wholly on evidence which is not disputed.

The defendant is entitled to judgment dismissing the complaint upon the merits.

Submit findings and judgment accordingly.