**Joseph PIGG, Appellant,**

v.

**E. J. ROBERTSON, Respondent.**

**No. KCD 27907.**

Missouri Court of Appeals,
Kansas City District.

April 4, 1977.

William B. Morgan, Campbell, Erickson, Cottingham, Morgan & Gibson, Kansas City, for appellant.

Clyde G. Meise, P. Thomas Loughlin, Meise, Cope & Jarrard, Kansas City, for respondent.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Action for damages for breach of confidential and fiduciary relationship and alternatively for declaration of a constructive trust. At the close of plaintiff's evidence in a trial to a jury, the court sustained defendant's motion for a directed verdict and judgment was entered against plaintiff. Plaintiff appeals.

Joseph Pigg and his wife lived in a rural area, near Oak Grove, Missouri. Pigg, formerly a farmer, was in the water hauling business. He had occasionally dealt in real estate. In early September, 1971, Frank Robinson, an Oak Grove real estate agent, told Pigg that a 100-acre farm, known as the "Church farm" and about a mile south of Pigg's place, was for sale for $25,000. Pigg was familiar with the farm and was interested in buying it. Because most of his assets were owned jointly with his wife, Pigg required her cooperation which she was reluctant to give.

On Sunday, September 12, 1971, Robinson again came to Pigg's farm house and asked Pigg whether he was ready to buy the farm. Robinson told Pigg he would be showing the farm to another prospective purchaser the next day. Pigg told Robinson he was interested, but his wife opposed the deal. That evening, however, his wife agreed to go along with her husband's idea.

Early in the morning of September 15, 1971, Pigg went to the Commercial Bank of Oak Grove to speak with its president, Mr. Hollis Dyer, about arranging a loan to buy the farm. Pigg had been a customer of the bank for about ten years and had made twelve to fifteen loans there over the years, dealing, with one exception, with Dyer. The one exception was when he dealt with Jim Brown at the bank on a loan for a water truck.

Pigg went into the bank and asked a teller if he could see Mr. Dyer. The teller told Pigg that Dyer was out of town and said "You can talk to Mr. Robertson." She directed Pigg to the office usually occupied by Dyer.

Robertson, a stranger to Pigg, was seated at the desk usually occupied by Dyer. Pigg introduced himself and proceeded to tell Robertson of his interest in purchasing the Church farm and in needing a loan for that purpose. Pigg described the farm and explained to Robertson the notes which he held and which he desired to use as collateral. Robertson told Pigg: "Well, I just can't use that type of collateral for a loan. You would have to talk to Mr. Dyer when he comes back." The conversation between Pigg and Robertson lasted three to five minutes. Pigg learned from Jim Brown that Dyer would be back on Friday.

Robertson did not tell Pigg that he was not an employee of the bank. He in fact was not. He was vice-president of the Corporation Service and Investment Company. That company had contracted with the Commercial Bank for an operational audit and Robertson was in the bank in that regard. Robertson had a degree in banking, and had worked in a bank in Kansas.

On Thursday, September 9, Dyer had told Robertson that the Church farm was for sale. (According to Robertson, the farm was described to him as the "Cox farm." The place had been previously owned by Church, but Robertson did not know the place by that name.) The next day Robertson went over the farm with Dyer and then he made an appointment with Robinson, the real estate agent, to go out to the farm with him on Monday. The two men went to the farm on Monday, but no contract of sale was entered into. On Thursday, Robertson obtained a commitment from the bank in Buckner for a loan to cover half the $25,000 purchase price of the farm.

Robertson, called by Pigg as an adverse witness at the trial, stated, on "cross-examination" by his own attorney, that from Pigg's conversation with him he was not aware that Pigg was interested in purchasing the farm in which Robertson was also interested. Robertson testified that he thought Pigg wanted to sell the bank a contract for a deed and that Pigg did not tell him he wanted to obtain a loan to purchase a farm.

Some hour and a half after his conversation of the 15th with Pigg, Robertson called Robinson and asked him to prepare a written contract for the sale of the farm. A contract for sale was entered into by Robertson on the 15th.

Pigg saw Dyer on the 17th and told him he wanted to talk about a loan to purchase the Church farm. Dyer told Pigg the farm had already been purchased by Robertson. Robertson sold the farm some seven months later for $45,000.00.

Plaintiff's petition alleged, in the circumstances of Robertson's presence in the bank and by Robertson's undertaking to listen to Pigg's communication, Robertson placed himself in a position of trust and confidence with regard to Pigg and the disclosure made to him by Pigg, imposing upon Robertson a duty to disclose to Pigg all material information relating to the subject matter of the conversation known to Robertson and a further duty not to divulge or personally profit from the information received from Pigg. The petition alleged that defendant violated such duty by not advising Pigg of his interest in the farm and by purchasing the farm himself after he had heard of Pigg's interest.

After evidence of basically the foregoing facts, offered by plaintiff, the trial court sustained defendant's motion for a directed verdict, stating:

" * * * [A]lthough the evidence may be sufficient to establish a reasonable belief in the mind of the plaintiff that he was dealing with someone who had some authority and therefore that there might have been a confidential relationship, there is no evidence, or insufficient evidence, of any breach of any such duty of any such relationship, if such were established."

In this court, appellant naturally agrees with the trial court's conclusion that a confidential relation existed between the parties, but disagrees with the conclusion that there was no evidence of a breach of duty arising out of that relationship. Respondent supports the trial court's finding in that regard and also contends that the evi-

dence did not support the finding of a confidential relationship.

Many cases may be found in which a general definition of the term "confidential relation" (or "relationship") may be found. In this case the parties have cited five such cases, none of which remotely approaches the factual situation here involved. Each party, interestingly, for his first case on the issue of existence of a confidential relation, has cited *McKeehan v. Wittels,* 508 S.W.2d 277 (Mo.App.1974). That case involved a principal-agent relationship which has long been recognized as a fiduciary relationship. *Groh v. Shelton,* 428 S.W.2d 911, 916[9] (Mo. App.1968). One consequence of that relationship is that the agent may not occupy a position antagonistic to his principal. *McKeehan v. Wittels,* supra, 508 S.W.2d at 281. However, in this case, appellant did not enter into an agency relationship with respondent, so that, although *McKeehan v. Wittels* may contain language from which both parties obtain solace, the actual holding of that case has little application here.

Appellant has also cited *Patton v. Shelton,* 328 Mo. 631, 40 S.W.2d 706 (1931). That case involved the existence of a fiduciary relation for purpose of application of the law pertaining to undue influence upon the execution of a will, again a situation far removed from that here involved.

Appellant's third case, *Selle v. Wrigley,* 233 Mo.App. 43, 116 S.W.2d 217 (1938), was concerned primarily with tolling of the statute of limitations in a fraud action, arising out of a situation quite dissimilar from this case.

Respondent also cites a will contest case, *Wilhoit v. Fite,* 341 S.W.2d 806 (Mo.1960), in which the court enumerated the facts which it found gave rise to a confidential relation between the testator and a beneficiary. The factors enumerated in that case bear little relation to this case.

In his examination of respondent, appellant's counsel inquired whether respondent was familiar with the "rules generally * * * about the confidential relationships between bank employees and the customers." Respondent replied that he was. However, no attempt was made to enlarge on the inquiry and in this court the briefs of both parties are entirely silent on the nature of the obligations which the law imposes by reason of dealings between a bank and its customers. Generally the relation of a general depositor to his bank is that of creditor-debtor, not a fiduciary relation. 10 Am.Jur.2d § 339, p. 302 (1963). The relation may give rise to some particular obligation, such as an obligation upon the bank not to disclose matters pertaining to the customer's account without his consent. See *Milohnich v. First National Bank of Miami Springs* (Fla.App.), 224 So.2d 759 (1969); *Peterson v. Idaho First National Bank,* 83 Idaho 578, 367 P.2d 284 (1961).

" * * * [W]hen a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer and inform him of every material fact relating to the transaction—including the bank's motive, if material, for participating in the transaction—unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him." *Klein v. First Edina National Bank,* 293 Minn. 418, 196 N.W.2d 619, 623[7] (1972).

In this case, appellant emphasizes that he placed his trust in respondent when he approached respondent to discuss the possibility of a loan. There would seem to be little doubt that, had the recipient of appellant's information and inquiry been, in fact, an officer or employee of the bank with no prior knowledge of the offer of the land for sale, appellant would have been entitled to relief had such person made use of the information imparted to deprive appellant of the opportunity to make the purchase. " * * * [I]f a person applies for a loan, and in connection with that application discloses his purpose to avail of a bargain which he had not as yet closed by contract, and of which the lender had not previously heard, the courts, whether of law or equity, would afford some form of adequate relief

in case the applicant was forestalled in his project by the lender." *M. L. Stewart & Co. v. Marcus,* 124 Misc. 86, 207 N.Y.S. 685, 692[7] (1924).

That case involved a somewhat similar situation to that here found, except that in that case the banker had been retained as an agent by another person interested in purchasing the property involved before the bank customer approached the bank official for a loan to purchase the property. Of interest is the further statement of the court:

"[6] The fact that plaintiff was a depositor in Marcus' bank is merely incidental, and significant in the present case only of the consideration that the borrower did not come uninvited to the lender. Of course, no man can obtrude either his trust or his secrets upon another, to the extent of imposing upon that other any obligation in regard thereto, any more than he can render another his bailee in invitum. In that respect banks present a constant invitation to intending borrowers, and thus subject themselves to whatever implication or obligation is to be drawn from that fact. In my opinion, however, the case would not be any different if the proposal were made to a private money lender, or even to an intimate friend, provided, always, that the application came to the lender at his invitation, express or implied, or with his equivalent consent."

Except for his occupation of the president's office, there is no evidence that respondent invited appellant's disclosure to him. There was no evidence that respondent had been authorized to sit in the president's office and advise with customers who might otherwise have called upon the president or another bank official. According to respondent, he remembered only two occasions when an employee of the bank directed a customer to him, one was in appellant's case and another involved a discussion of investment matters with a customer who was also a director of the bank. However, respondent acknowledged that, during Mr. Dyer's absence, bank employees asked him questions posed to them by customers and relayed respondent's replies to customers. Thus, respondent was aware that he was being called upon to provide advice for customers and a jury would have been entitled to find that a bank customer approaching respondent, under the circumstances in which appellant did so, had a right to expect that his disclosures would be given the same protection they would have received had they been made to a regular bank officer and that respondent could reasonably be expected to know that such reliance was placed in him. Therefore, it follows that appellant's evidence was sufficient to permit a jury to find that a confidential relation did exist between appellant and respondent and the trial court correctly so found.

Given the existence of a confidential relation, there was evidence from which the jury could have found a breach by respondent of obligations resulting from such relation. In his brief, respondent states: "The most obvious fact essential to Appellant's theory of recovery is that Mr. Robertson knew that the farm being described by Mr. Pigg was the same farm that Robertson eventually purchased. *Being possessed of that knowledge, Mr. Robertson might well have had a duty to reveal his interest in the property to Pigg.*" (Emphasis supplied)

Respondent's argument that there was no evidence from which it could have been found that Robertson knew that Pigg and he were interested in the same farm must be rejected. According to Robertson, Pigg didn't even tell him that he was interested in purchasing a farm. Pigg testified that he did tell Robertson that was the reason he wanted to make a loan and that he described the farm to Robertson. From Pigg's testimony and the evidence of the hurried activity of Robertson to contract for the purchase of the farm following his conversation with Pigg, the jury could find that Robertson knew that Pigg was interested in the farm. In addition to the facts above stated, it was stipulated that Dyer, if called to testify, would state that he spoke by telephone to respondent on September 14 and respondent at that time told Dyer he

was "planning to take no action regarding [buying the farm] until Dyer returned."

There was, therefore, evidence not only from which a confidential relation could have been found, but also evidence to support a finding of a breach of the obligations flowing from such a relation and the trial court should not have directed a verdict for the respondent.

Appellant asks consideration of two additional matters involving rulings by the trial court on evidentiary matters, not pertinent to the determination of whether or not plaintiff made a submissible case. Inasmuch as those questions may or may not recur on a new trial and if they do, may recur in a varied context, it is unnecessary and perhaps unwise to determine them on this appeal.

Judgment reversed and cause remanded for new trial.

All concur.