OPINION OF THE COURT
Herman Cahn, J.
The primary question presented in this action, novel in New York and most other jurisdictions, is whether a commercial bank breaches a fiduciary duty by agreeing to finance the hostile takeover of one corporate customer by another. The *961 court finds that a bank has no per se obligation to refrain from such participation and that plaintiff has not pleaded the existence of a fiduciary relationship which might give rise to such an obligation. However, the complaint states a claim to the extent it pleads that plaintiff’s — the target customer— confidential, nonpublic information was directly disseminated to the acquiring company or used by the bank in advising the acquirer.
THE COMPLAINT
ADT Operations, Inc. (ADT), through various subsidiaries, is engaged in the electronic security service and vehicle auction service businesses in the United States. It has 16,500 employees nationwide and had 1995 annual revenues of $1.1 billion. The shares of ADT’s parent company, ADT Limited (Limited), are publicly traded. Chase is a national banking association which maintains, inter alia, separate divisions for its lending and investment banking activities.
The complaint alleges that ADT first approached Chase to secure debt financing in 1992. At the time, the ADT companies felt vulnerable to takeover attempts because ADT Limited had recently concluded litigation with one of its major shareholders, Laidlaw, Inc., in which Laidlaw sought to place representatives on ADT’s board. Accordingly, in addition to its desire to restructure approximately $670 million in outstanding debt, ADT was seeking "to forge a long-term relationship with a leading lending institution * * * to provide counsel and advice in the event of such a takeover attempt.”
In August 1993, ADT entered into a $500 million loan credit facility with a consortium of banks which was co-managed by Chase. The facility was renewed in 1995. According to ADT, in organizing and effecting this financing, "Chase assumed the role of a financial advisor and encouraged ADT operations to confide in the bank with respect to every facet of its business and operations.” Members of Chase’s Multi-National Corporate Group stated that they wanted to help ADT formulate a strategic plan to expand the company’s business in the United States. In the course of its discussions with Chase, ADT provided "highly sensitive non-public financial documents which contained internal projections over several years; detailed profit and loss statements for every major subsidiary; internal budgets for each subsidiary; reports and analysis for ADT’s internal operations; reports on corporate strategies and planning; and other trade secrets and proprietary information of *962 ADT Operations and its affiliates.” Furthermore, "Chase acquired intricate knowledge of the infrastructure of ADT Operations and the other ADT companies.”
ADT claims that it provided the confidential information to Chase under the express understanding that it would remain confidential and that Chase would use it only for the purposes relating to the credit loan facilities and for providing financial advice to ADT. Chase allegedly signed a confidentiality agreement to that effect and confirmed the understanding in other writings.
ADT also claims that in discussing the original loan facility, Chase representatives stated that it was the bank’s policy not to finance or otherwise assist in the hostile takeover of a bank customer without the customer’s consent. Members of Chase’s Multi-National Corporate Group and its Structured Finance Division reiterated this policy in various meetings and conversations with ADT officers. In one of the earlier meetings, Chase representatives stated the bank would not participate in a takeover of ADT because "they viewed the relationship between the ADT companies and Chase as a special one.” ADT claims it relied on these statements in deciding to enter into the 1993 loan agreement and to continue its relationship with Chase.
Nevertheless, ADT alleges, on December 18, 1996 it learned that Chase intended to finance the $900 million cash portion of a hostile takeover of ADT by Western Resources, Inc. Western already owns approximately 27% of ADT, having acquired most of its shares (23%) from Laidlaw. ADT claims that although Western is inexperienced in the security services business, it intends to commence a proxy battle to remove all existing ADT directors and replace them with candidates nominated by Western at an imminent shareholders meeting. ADT alleges, upon information and belief, that in advising and financing Western in connection with the proposed hostile takeover, Chase has supplied Western with proprietary and confidential information obtained from ADT.
ADT accuses Chase of breach of fiduciary duty; breach of an "express agreement” not to fund a hostile takeover; breach of an implied covenant of good faith and fair dealing; breach of the confidentiality agreements; deceit and intent to defraud; negligent breach of fiduciary duty; and seeks a permanent injunction prohibiting Chase from participating the hostile takeover or disclosing ADT’s confidential information.
*963 THE MOTION TO DISMISS
Chase has moved to dismiss the complaint (CPLR 3211 [a] [7]) and the court shall apply CPLR 3211 (a) (7) standards only.
Breach of Fiduciary Duty
The first and sixth causes of action allege that Chase intentionally or negligently breached its fiduciary duties to ADT by financing and advising Western in its takeover efforts.
A fiduciary duty may be created by the express provisions of a contract, or by factors such as the length of the relationship of the parties, their financial interdependence, and their sharing of confidential and proprietary information (ZimmerMasiello, Inc. v Zimmer, Inc., 159 AD2d 363, 365, lv dismissed 76 NY2d 772). However, not every commercial contract or relationship creates a fiduciary duty (see, Neumann v Metropolitan Med. Group, 153 AD2d 885, 887-888). "If the parties find themselves or place themselves in the milieu of the 'workaday’ mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them” (Northeast Gen. Corp. v Wellington Adv., 82 NY2d 158, 162).
In this spirit, the New York courts have generally held that the legal relationship between a customer and a bank is an arm’s length, debtor/creditor relationship which does not, without more, create a fiduciary relationship (Marine Midland Bank v Hallman’s Budget Rent-A-Car, 204 AD2d 1007; Bank Leumi Trust Co. v Block 3102 Corp., 180 AD2d 588, 589, lv denied 80 NY2d 754; Nathan v J & I Enters., 212 AD2d 677 ["plaintiffs argument that his status as a depositor created a fiduciary duty with respect to all banking transactions is unsupported by law”]; see also, Manufacturers Hanover Trust Co. v Yanakas, 7 F3d 310, 318 ["the mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary”]).
A fiduciary relationship may arise between a bank and its customer where the bank assumes control and responsibility over the customer’s assets and operations, or where the customer places special trust and confidence in the bank and thereby becomes dependent upon it (see, Manufacturers Hanover Trust Co. v Yanakas, supra, at 318; Chimento Co. v Banco Popular, 208 AD2d 385, 386; Scott v Dime Sav. Bank, 886 F Supp 1073), but there-is "no legal authority for the prop *964 osition that a normal commercial relationship between a bank and a customer assumes a fiduciary nature whenever the officers of a company and the officers of the bank become friendly” (Chimento Co. v Banco Popular, 208 AD2d, at 386).
Here however, the complaint alleges a relationship in which the plaintiffs officers are claimed to have placed substantial trust in defendant’s officers. Thus, what is claimed is not merely a debtor relationship but one which is much broader.
Plaintiff argues that the court should find a per se obligation on the part of Chase to refrain from participating or assisting in the hostile takeover of one of its customers. However, in the two reported cases which have considered the issue, neither applying New York law, the courts have found no such per se obligation. In American Medicorp v Continental Ill. Natl. Bank & Trust Co. (475 F Supp 5 [ND Ill 1977]) the defendant bank loaned money and performed other banking services for the ultimate target company, acquiring a file of nonpublic financial and other data including a five-year projection. After that relationship had "flourished” for about a year, the bank agreed to participate in a loan to a second customer to enable it to obtain a controlling stock interest in the first. Two of the bank’s officers assigned to the acquiring company loan had access to the target customer’s credit file; one had "flipped through” a 13-page summary and extracted portions concerning proposed loans to the target, and the other had read documents concerning the company’s proposals for financing a hospital. Additionally, two bank officers working for the acquiring company met informally with two officers assigned to the target company’s account to advise them of the proposed acquisition loan, and the four discussed the amount of the potential loss of business from the target company due to the deal.
In denying a preliminary injunction sought to enjoin the bank from making the loan to the acquiring company, the District Court noted that there were no governmental restrictions on the bank’s conduct and held that "a bank is not precluded under all circumstances from making a loan to facilitate the attempted takeover of a customer” (American Medicorp v Continental Ill. Natl. Bank & Trust Co., supra, at 8). Furthermore, the court found that "[t]he fact that some of defendant’s officers who were responsible for the [acquiring company’s] loan obtained, saw, touched, and to some extent used and interchanged information from the defendant’s files on plaintiff, in our opinion, [was] not a per se violation of a trust” (American Medicorp v Continental Ill. Natl. Bank & *965 Trust Co., supra, at 9). In particular, the court noted that there was no evidence that the bank used or relied on the allegedly confidential material in deciding to make its loan to the acquiring company or that the information was transmitted to the officer primarily in charge of that loan. The court concluded that "[i]f it does not rely on the confidential information of its customers in its files, we believe that a bank is free to deal with any customer who comes to it” (American Medicorp v Continental Ill. Natl. Bank & Trust Co., supra, at 8).
The Third Circuit Court of Appeals in Washington Steel Corp. v TW Corp. (602 F2d 594 [3d Cir 1979]), under similar circumstances, also rejected a per se rule prohibiting a bank’s financing of a hostile takeover of one of its customers. In Washington Steel the bank entered into a $10 million credit agreement with the target customer and received, over a five-year period, certain nonpublic information including a nine-year projection of cash flow and earnings and certain quarterly and annual financial statements. The bank, although not the lead bank in the credit transaction, served as one of two registrars for the customer’s common stock.
After learning that the bank was financing another customer’s hostile takeover bid, the target company was granted a preliminary injunction. In reversing, the Third Circuit expressly adopted the reasoning of American Medicorp (supra) and found a per se rule objectionable on "important policy grounds”: "To imply a common law fiduciary duty of banks not to deal with competitors of their borrowers, or even just potential acquirers of those borrowers, could wreak havoc with the availability of funding for capital ventures * * * Companies seeking to insulate themselves from takeovers, or even from ordinary competition, could simply arrange for a series of loans from most of the major banks, supplying those banks with the requisite non-public information. Under the per se rule urged by [plaintiff], the banks would thereby be foreclosed from financing competitors and potential acquirers of the borrowing firms. As the American Medicorp court recognized, such a result 'would tend to burden the free flow of bank financing and the ability which a bank now has to deal with customers who may have adverse interests to other customers.’ ” (Washington Steel Corp. v TW Corp., supra, at 601.)
Like the American Medicorp court, the court in Washington Steel (supra) found that there was no evidence that the bank has used the target company’s confidential information in deciding whether to finance the takeover. However, the *966 Washington Steel court broadened the holding of American Medicorp (supra), and held that a bank would not have violated any duty to the target depositor even if it had used such information: "To prohibit a bank from considering all available information in making its own loan decisions might engender one or both of two undesirable outcomes. First, it might force banks to go blindly into loan transactions, arguably violating its duties to its own depositors. Alternatively, such a rule might discourage banks from lending money to any company which expresses an interest in purchasing shares of stock of another of the bank’s customers. The adverse implication of this result for the free flow of funds is precisely the reason why we rejected the per se rule urged by [plaintiff]. Bank-credit is, after all, the largest part, by far, of the national money supply.” (Washington Steel Corp. v TW Corp., supra, at 603; see, Note, Bank Financing of Hostile Takeovers of Borrowers: Washington Steel Corp. v. TW Corp., 93 Harv L Rev 440 [1979]; Note, Bank May Use Confidential Information Obtained From Prior Contacts with Target Company to Evaluate Takeover Loan, 65 Cornell L Rev 292 [1980].)
The Washington Steel court distinguished an older New York case, Stewart & Co. v Marcus (124 Misc 86 [Sup Ct, NY County 1924]), wherein the court suggested that a bank’s fiduciary duties might prohibit it from taking undue advantage of confidential information communicated by a customer in applying for a loan. As the Washington Steel court noted, however, the precise holding of Stewart was that the defendant bank did not breach a duty by purchasing real property on behalf of one customer after promising to finance the acquisition of the same property by another. The court found no relationship of trust had arisen because the information communicated to the bank by the customer seeking the financing— that it had already won the bid for the property — was erroneous and therefore not a true confidence. Furthermore, the Stewart court confirmed that the usual bank/depositor relationship did not in itself create a fiduciary duty. It observed that most cases finding a fiduciary relationship between a bank and its customer relied upon "the existence of an actual agency or trusteeship” of the bank in connection with a particular transaction (Stewart & Co. v Marcus, supra, at 90). The court also stressed its own duty "to harmonize the necessities of a competitive industrial system of business with the teachings of morality” and suggested that judicial intervention might be appropriate only where "the transaction is condemned by the *967 wholesome moral sense, the mores, of the community” (Stewart & Co. v Marcus, supra, at 92, 91). The Washington Steel court thus concluded that New York law, at least as exemplified by Stewart, "undercut” the propriety of a per se rule prohibiting a bank from financing the takeover of one of its borrowers.
The court concurs with the reasoning of the Washington Steel decision (supra), finding it consistent not only with Stewart (supra) but with New York law as it has since developed. As noted, the New York courts have never adopted the notion that a mere debtor/creditor relationship between a bank and a customer creates a fiduciary duty, and have imposed such a duty only in extreme cases involving grossly unequal bargaining power or the domination or control of the customer by the bank. Likewise, a fiduciary duty is not created by the mere communication of confidential information from the customer to the bank, which is a necessary incident of virtually any extension of credit (see, Stewart & Co. v Marcus, supra, at 92; American Medicorp v Continental Ill. Natl. Bank & Trust Co., 475 F Supp, supra, at 8 [noting that financial statements and projections are "the customary package of documents presented by a prospective borrower to a financier”]). A customer’s unilateral placement of confidence or trust in a bank does not obligate the bank to observe that confidence or protect the confidentiality of any information so received where the parties have otherwise dealt at arm’s length (see, Stewart & Co. v Marcus, supra, at 92 ["(o)f course, no man can obtrude either his trust or his secrets upon another to the extent of imposing upon that other any obligation in regard thereto, any more than he can render another his bailee in invitum”]-, see also, Walton v Morgan Stanley & Co., 623 F2d 796, 799 [rejecting claim that investment bank became fiduciary of target company merely because company’s management delivered confidential information and placed its confidence in the bank not to disclose the information; the court applied Delaware law]).
As a matter of policy, a per se rule might unduly restrict banks in providing credit to competing customers, and might thus unduly reduce the pool of available credit. The court notes that Chase is a bank which has a national presence. Any rule which might have such a broad impact should be considered by the Legislature or appropriate administrative or oversight agencies. (For a further discussion of the policy reasons against a per se rule, see, 93 Harv L Rev, op. cit., at 445.)
Although ADT alleges that it was "seeking to forge a long-term relationship with a leading lending institution to provide *968 financing as well as counsel and advice in the event of * * * a takeover attempt,” it does not claim that Chase ever agreed to provide anything but the financing. Likewise, while ADT pleads that Chase officials stated that they "wanted” to help ADT with its nationwide strategic planning, there is no meaningful description of what Chase did in this regard, if anything. The allegations of a fiduciary relationship are purely conclusory, i.e., "[f]rom its inception, the relationship between Chase and ADT Operations was more than that of a lender and borrower”; "Chase assumed the role of financial advisor and encouraged ADT Operations to confide in the bank with respect to every facet of its business and operations”; "Chase’s officers made it clear that it wanted to create a much broader relationship which would encompass advising the ADT companies on a wide range of strategic issues.” However, it appears that the only "financial advice” Chase rendered to ADT was in connection with the restructuring of its debt through the loan facilities. And although ADT states that Chase’s officers repeatedly explained the bank’s "policy” against financing hostile takeovers, there is no claim that the bank ever agreed to become ADT’s advisor or agent in that regard (compare, General Acquisition v GenCorp, Inc., 766 F Supp 1460).
Accordingly, the first and sixth causes of action premised upon a breach of fiduciary duty are dismissed. As the fifth cause of action for "deceit and intent to defraud” is premised upon an alleged "special relationship” between the parties, it too is dismissed.
Breach of Confidentiality Agreements
The fourth cause of action alleges that "Chase has breached its confidentiality agreements with ADT Operations by using confidential and proprietary information of ADT Operations in its own internal deliberations as to whether to assist and fund Western in a hostile takeover of ADT Operations and its affiliates.” Furthermore, it is alleged that Chase "also breached the confidentiality agreements by, upon information and belief, sharing or utilizing confidential and proprietary information of ADT Operations in connection with Chase’s advisory role to Western.”
The first allegation regarding Chase’s internal use of the confidential information would, ordinarily, fail to state a claim. As noted above, Chase owed no fiduciary duty to ADT to refrain from financing and assisting Western, and important policy reasons permit Chase to review its internal records in making *969 loan decisions regarding other customers (see, Washington Steel Corp. v TW Corp., 602 F2d 594, supra). However, the parties entered into a written confidentiality agreement, dated November 10, 1992, which forbade Chase to use certain information "other than in connection with [Chase’s] engagement under the Engagement Agreement.” The Engagement Agreement, supplied by Chase, obligated the bank to provide a debt restructuring analysis for ADT by November 20, 1992, which it did. Accordingly, ADT may well have a claim for breach of the written agreement to the extent the bank used any of the information received pursuant to the Engagement Agreement in connection with its 1996 decision to assist Western. The claim does not extend to any information received outside the Engagement Agreement, i.e., after it terminated on November 20, 1992, and is of course subject to the terms of the confidentiality agreement, which does not cover publicly available or previously disclosed information.
ADT also states a claim with its second allegation that Chase directly or indirectly communicated any of ADT’s confidential information to Western. Although, as noted above, a bank’s mere receipt and internal use of confidential information in making its financing decisions does not create a fiduciary duty, courts have implied that an actionable "misuse” of such information might occur where the bank communicates it directly or indirectly to the acquiring company. For example, the Washington Steel court, which took the most restrictive view of the fiduciary duty owed by a bank to its customers, nevertheless emphasized that it was condoning only dissemination of confidential information within the bank’s commercial loan department. The court suggested, without deciding, that a bank’s dissemination of confidential information to the acquiring company itself might be unlawful. Similarly, it cautioned that the dissemination of the information outside the loan department, to a separate bank department whose function it was "to recommend particular investments to its clients”, might be prohibited (Washington Steel Corp. v TW Corp., supra, at 603).
The complaint alleges that Chase is Western’s financial advisor and a deal manager in connection with the efforts to take control of the ADT companies. Under the circumstances, the communication of ADT’s confidential financial data to its hostile suitor would appear to be "condemned by the wholesome moral sense, the mores, of the community” (Stewart & Co. v Marcus, supra, at 91). Even if ADT could not reasonably *970 expect the bank to ignore the information in making its own business decision to finance Western, it was entitled to expect that Chase would not betray its confidences directly to that third party. Indeed, as acknowledged by Chase in connection with the pending preliminary injunction motion, the bank’s own internal policies forbid such disclosure and create a "Chinese Wall” between its corporate loan department and its mergers and acquisitions division. While not every breach of such a wall is material (see, Washington Steel Corp. v TW Corp., supra; American Medicorp v Continental Ill. Natl. Bank & Trust Co., supra), any breach which directly assists Western or gives it an unfair advantage in its takeover efforts are actionable.
Chase objects that allegations regarding the misuse of confidential information have been made only upon information and belief, and various Chase officers involved with the relevant transactions have submitted affidavits denying any breach of confidentiality. However, plaintiff is entitled to conduct further discovery on the issue under CPLR 3211 (d), since the facts concerning the bank’s actual use of the confidential information are within its sole knowledge and possession (see, Cantor v Levine, 115 AD2d 453; see also, Washington Steel Corp. v TW Corp., supra; American Medicorp v Continental Ill. Natl. Bank & Trust Co., supra [deposition and document discovery conducted on issue of bank’s dissemination of confidential information]).
The motion to dismiss the fourth cause of action is therefore denied. Since the seventh cause of action for a permanent injunction is based, in part, upon Chase’s alleged dissemination of confidential information to Western (or use of such information in advising Western), the motion to dismiss that cause of action is denied as well.
Accordingly, it is ordered that the motion to dismiss is granted as to the first, second, third, fifth and sixth causes of action, and those claims are severed and dismissed, and it is further ordered that the clerk is directed to enter judgment accordingly, and it is further ordered that the remainder of the action shall continue.