**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 29 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DEAN WITTER REYNOLDS INC.,

Plaintiff-Appellant,

v.

THE VARIABLE ANNUITY LIFE
INSURANCE COMPANY,

Defendant-Appellee.

No. 02-1418

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 99-M-1612)**

---

Stuart N. Bennett (Eric B. Liebman and Jeffrey A. Aramowicz with him on the
briefs), Brega & Winters, P.C., Denver, Colorado, for Plaintiff-Appellant.

M. Gabriel McFarland, Bieging Shapiro & Burrus LLP, Denver, Colorado, for
Defendant-Appellee.

---

Before **SEYMOUR, McKAY,** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

In a world of instantaneous electronic fund transfers and online financial transactions, one would think that the old problems of disappearing checks, uncertain mail deliveries, and unknown thieves – long the staple of law school hypotheticals – would cease to have much practical significance. In this case, however, Defendant, the Variable Annuity Life Insurance Company ("VALIC"), opted to do it the old-fashioned way: It sent two checks via the postal service to its customer's broker in Houston, Texas. True to form, an unknown thief intercepted one of the checks and used it to open a fraudulent account in Los Angeles. As a result of vacations, horse-and-buggy procedures, and (allegedly) willful foot-dragging and miscommunications, payment was not stopped on the stolen check until some two months after it was mailed – by which time the thief had made away with most of the proceeds. In determining who should bear the loss, this Court has found it necessary to blow the dust off of ancient common law doctrines of negotiable instruments, bailments, and assignability of choses in action. In tribute to the enduring character of the common law, we apply these legal concepts to this twenty-first century dispute.

## I.    Background

The facts in this case are largely undisputed, and we record them essentially as stated by the district court.

In September of 1998, Mrs. Merle Bass, a customer of VALIC, requested

that the two accounts she maintained be liquidated and the proceeds sent to Dean Callender, a securities broker at Dean Witter's Houston office. To accomplish this transfer, Mrs. Bass filled out the appropriate "Rollover/Transfer Out Request Form" ("the Form").

As a result, VALIC generated two checks. The first ("Check I") was cut on September 29, 1998, for the amount of $211,041.66. The second ("Check II") was cut on September 30, 1998, for $126,947.59. Both checks were made payable to "Morgan Stanley Dean Witter FBO: Merle B. Bass" and contained Mrs. Bass's social security number.

Thereafter, Mrs. Bass left the country on a three-week vacation. Shortly after her return, on November 2, 1998, she called the Dean Witter office in Houston and discovered that the funds had not arrived. This prompted her to contact VALIC, which informed her that the checks had been mailed as per the instructions on the Form. According to Mrs. Bass, during this conversation she asked that VALIC stop payment on both checks. In any event, it is undisputed that on November 12, 1998, someone from Dean Witter's Houston office spoke to VALIC and requested stop payments on both Check I and Check II.

VALIC issued the stop payment order on November 16, 1998, and payment on Check II was stopped. Check II was reissued and the funds were eventually received by the Houston office. As to Check I, however, VALIC was unable to

fulfill the stop payment request because the check had already been negotiated on November 9, 1998, and paid by VALIC's bank on the following day.

In December, Dean Witter became aware of a suspicious account opened in its Los Angeles office. Investigation revealed that the account was opened in the name of "Mevle Bass" using Merle B. Bass's social security number, which was printed on the face of the check. Someone – presumably the person who stole the check – had been depleting the account since November 24, 1998. Dean Witter promptly froze the account, but by that time, over $160,000 had been stolen.

Dean Witter reimbursed Mrs. Bass for her loss, and in exchange Mrs. Bass assigned her claims to Dean Witter. Dean Witter then initiated this action against VALIC in the District of Colorado pursuing claims under theories of: (i) misdelivery of bailment, (ii) breach of contract, (iii) fraud, (iv) promissory estoppel, (v) the Colorado Consumer Protection Act (C.R.S. §§ 6-1-101 *et seq*. "CCPA"), and (vi) breach of fiduciary duty. The contract, bailment, and fiduciary claims are all premised on Dean Witter's assertion that its non-receipt of the checks constitutes failure by VALIC to perform its duties under the various agreements entered into with Mrs. Bass. The fraud, promissory estoppel, and CCPA claims likewise have a common point of departure. In essence, Dean Witter claims that VALIC knew or should have known that Check I had been negotiated on November 10, 1998, yet it continued to reassure Mrs. Bass that her stop

payment request would be processed and honored. According to Dean Witter, Mrs. Bass relied on this information and did not further pursue the matter with VALIC until November 30. These dates are significant because the thief did not begin to deplete the account until November 24. Dean Witter argues that had VALIC provided Mrs. Bass with accurate information regarding Check I, the account would have been frozen prior to the thief's depletion of the funds.

VALIC, on the other hand, maintains that responsibility for the theft lies with Dean Witter. VALIC argues that since the check was negotiated by Dean Witter and the fraudulent account was opened in its Los Angeles branch with Mrs. Bass's social security number, Dean Witter should have realized that the check missing from its Houston office was used to open an account in its Los Angeles office. VALIC thus argues that Dean Witter was in the better position to prevent the theft.

The district court largely agreed with VALIC's view of the case and granted it summary judgment on all claims. We agree with its analysis of the fiduciary claim and affirm its decision as to that claim. We also affirm its judgment with respect to the bailment claim. For reasons discussed below, however, we reverse the district court's conclusion as to the fraud, estoppel, CCPA, and breach of contract claims, and remand for further proceedings.

We emphasize that this case comes to us on appeal from the district court's

grant of summary judgment in favor of defendant VALIC on all claims. Thus, the issue is not which party ultimately will or should prevail, but whether there are any disputed questions of material fact, drawing all reasonable inferences in favor of Dean Witter as the party opposing the grant of summary judgment. We review the grant of summary judgment *de novo*, applying the same standards used by the district court. *Midland Mortg. Co. v. United States Fidelity and Guar. Co.*, 301 F.3d 1277, 1279 (10th Cir. 2002). Because this case reaches us pursuant to diversity jurisdiction, we apply Colorado law as if this case were brought in Colorado state court. *Id.*

## II. Liability for Misdelivery

We begin with the contract claim because the district court's analysis of that issue guided its thinking about the entire case. Further, as explained below, our interpretation of the contract depends in part on our analysis of the bailment claim.

The district court interpreted the Form signed by Mrs. Bass as a contract requiring:

> VALIC to transfer her funds by mailing them to:
>
> Morgan Stanley Dean Witter
> FBO: Merle B. Bass
> The Callenders
> 1990 Post Oak Blvd., Suite 2000
> Houston, Texas 77056.

-6-

Op. 2.

Proceeding on this assumption, the court considered whether VALIC failed

to perform its duties under this contract.  In granting VALIC summary judgment

the court reasoned:

> [T]he evidence does not show that VALIC failed to perform its
> promised service with respect to the checks.  The instructions
> of Mrs. Bass on the Rollover/Transfer Out Request Form
> directed VALIC to transfer the funds by mailing them to the
> address set forth on the form.  The evidence submitted by
> VALIC shows that the checks were made payable to the proper
> party and addressed correctly.  VALIC asserts that it mailed the
> checks, and there is no evidence that it did not.  The fact that
> the checks did not arrive at Dean Witter's Houston office does
> not prove that VALIC failed to follow Mrs. Bass's instructions.
> . . . The plaintiff's evidence with respect to delivery of the
> checks does not provide a sufficient basis for its claims for
> violation of the CCPA, breach of contract, promissory estoppel,
> or breach of fiduciary duty.

Op. 6.

As an initial matter, we are somewhat hesitant to adopt the district court's

interpretation of the contractual agreement between Mrs. Bass and VALIC as

memorialized in the Form.  First, while the Form may be construed as instructing

(or at least authorizing) VALIC to transfer her funds by mail, it does not imply

that placing a check in the mail will satisfy any obligation created by Mrs. Bass's

deposit of funds with VALIC.  Moreover, the Form is silent with regard to the

allocation of risk while the payment is in transit.  Nothing in the contract leads us

to understand that by filling out the payee's mailing address Mrs. Bass assumed

the risk of the check being stolen en route.

Parties are presumed to contract with reference to existing principles of law, and in the absence of clear contractual language the relationship is governed by the rules mandated by law. *See* 11 *Williston on Contracts* § 30:19 (4th ed.1997); *see also* C.R.S. § 4-1-102 (unless specifically modified by contract, Colorado's U.C.C. rules apply). For this reason, the nature of the legal relationship between Mrs. Bass and VALIC is relevant to understanding the contract. In its motion for summary judgment, Dean Witter argued that VALIC was Mrs. Bass's bailee and should be liable for misdelivery of bailment. If we were to accept Dean Witter's theory, the gap in the contract would be filled by the common law rules governing the bailee's obligation to redeliver the bailment. VALIC, however, responded that the relationship between a depositor and a financial institution is not that of bailor/bailee but of creditor/debtor. Under VALIC's interpretation, the contract should be read in light of the law governing a debtor's obligation to remit payment to the creditor. We find that under either construction, the district court's grant of VALIC's summary judgment motion on the contract claim was improper.

Dean Witter presented two versions of its bailment claim. First, in briefs filed in district court in support of its motion for summary judgment, Dean Witter argued that the check was the *res* of the bailment. In argument before the district court, Dean Witter argued principally that the funds themselves were bailed to

VALIC. *Id.* at 145-46. As we understand either version of Dean Witter's argument, a finding that VALIC was Mrs. Bass's bailee would subject VALIC to liability under the onerous standards for misdelivery of bailment. "*Any unauthorized delivery of bailed property by a bailee* – even delivery to the wrong person resulting from the bailee's good faith mistake – constitutes a conversion." *Fireman's Fund Ins. Co. v. Wagner Fur, Inc.*, 760 F. Supp. 1101, 1105 (S.D.N.Y. 1991) (emphasis in original), *citing Restatement (Second) of Torts § 234 & cmt a.* Further, "bailees are 'not only liable for losses occasioned by their negligence, but for those which arise from innocent mistakes in the delivery of goods to persons not entitled to receive them.'" *Id.*, *quoting Bank of Oswego v. Doyle*, 91 N.Y. 32, 42 (1883).

The district court, however, found that no bailment was created and dismissed the claim in an oral ruling from the bench. Its dismissal was premised on two assumptions: first, that the check itself does not constitute personal property and therefore is not the proper subject of a bailment, and second, that with respect to the funds, VALIC was Mrs. Bass' debtor, not her bailee. Dean Witter challenges this ruling on appeal.

While early common law doctrine held that only corporeal personal property could be the subject of a bailment, for nearly a century it has been "well settled . . . that there may be a bailment of incorporeal as well as corporeal

personalty. . . . . Thus, there may be a bailment of negotiable notes, bonds, corporate stock and insurance policies as well as horses, watches or furniture." Armistead M. Dobie, *Handbook on the Law of Bailments and Carriers* 20 (1914).

A check is undoubtedly a negotiable instrument, *see Wedge Mines Co. v. Denver Nat'l Bank*, 73 P. 873, 875 (Colo. Ct. App. 1903); C.R.S. § 4-3-104 (check is a negotiable instrument under the U.C.C.), and the check itself, which can be assigned to others, takes on commercial significance apart from the underlying funds it represents. *See, e.g.*, *Meyers v. Johanningmeier*, 735 P.2d 206 (Colo. Ct. App. 1987) (in general, a holder in due course takes the instrument free from all claims and defenses of any party to the instrument); C.R.S. § 4-3-301, 3-302 & 3-305 (defining rights of holders in due course under the U.C.C.). Thus, there is little doubt that under Colorado law, if A gives B a check to deliver to C, B is A's bailee and can be liable for misdelivery.

VALIC, however, is correct to point out that the relevant question is not whether a check in the abstract can be bailed, but the status of *this* check as it relates to Mrs. Bass's funds deposited with VALIC. After all, the check was drawn up by VALIC, and payable from VALIC's funds. It is far from clear that this check is best characterized as a bailment of Mrs. Bass's funds rather than as VALIC's attempt to satisfy its debt to Mrs. Bass. The answer to this question depends largely on the common law status of deposits with financial institutions.

-10-

Some 140 years ago, the United States Supreme Court summarized the

considerations as follows:

> All deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter; and that other kind of deposit of money peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money, and loans it to the banker; and the latter, in consideration of the loan of the money and the right to use it for his own profit, agrees to refund the same amount, or any part thereof, on demand.

*Marine Bank v. Fulton Bank*, 69 U.S. 252, 256 (1864). The common law thus

conceptualized a general deposit as a loan of the funds to the financial institution.

Unlike a bailment, a general deposit passes title to the financial institution, which

is required to repay the loan from its own funds upon demand.[1]

In general, the law presumes that deposits made to financial institutions in

---

[1]This distinction is of ancient origin and appears in the Mishna, a second century compilation of Jewish law. The Mishna teaches:

> One who deposits monies with a money exchanger: If they are bound together [and sealed], the exchanger may not lend them out. Therefore if they are lost [through no negligence of the exchanger] he is not liable for the loss. If the money was delivered as loose coins, the exchanger may lend them out. Therefore if they are lost, the exchanger is liable [as a debtor]. However, if one deposits coins with a householder, whether they are bound or loose, the householder may not lend them out, therefore he is not liable for their loss [except in cases of his own negligence].

Mishna, Bava Metzia Chapter 3 § 11 (as interpreted by B. Talmud, Bava Metzia 43a; C. Saiman, trans.).

the ordinary course are general deposits; the burden rests on the depositor to prove otherwise. *See Peoples Westchester Savings Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992); *Keyes v. Paducah & I.R. Co.*, 61 F.2d 611, 613 (6th Cir. 1932). "A special deposit is one made under an express or clearly implied agreement that is for some particular purpose, while a general deposit includes all others forms of deposits." 5B *Michie on Banks and Banking* § 328, at 533 (2002). Thus, while courts have held that monies placed in accounts for certain specific purposes, such as escrow accounts, are special deposits, *see* 9 *N.Y. Jur. 2d*, *Banks and Financial Institutions* § 263; 5B *Michie* § 332 at 552-55, in the ordinary course, title to deposited funds passes to the bank and a debt in the amount deposited is created between the financial institution and the depositor. *See* 5B *Michie* § 328, at 535-37. Dean Witter has not pointed to any agreement, express or implied, indicating that the funds were held specially, and we therefore conclude that Mrs. Bass's account with VALIC is properly characterized as a general deposit. It follows that VALIC's attempted transfer of funds by means of mailing a check to Mrs. Bass's broker was not the delivery of a bailment but an attempt to satisfy its outstanding obligations as Mrs. Bass's debtor.

But this does not mean that VALIC bears no legal responsibility for misdelivery of the check. Just as a bailee has the duty to redeliver the bailment at the instructions of the bailor, a debtor is obliged to remit payment to the creditor

or his order. Based on the record as it stands, we conclude that the district court erred in granting summary judgment in favor of VALIC on the contractual claim.

In essence, the district court held that the contract between Mrs. Bass and VALIC required only that VALIC mail the check in accordance with her mailing instructions – not that funds actually be transferred to her in satisfaction of her deposit. We think this takes too narrow a view of the contractual relation between Mrs. Bass and VALIC. In general, a debt is discharged not when the debtor mails a check, but when the creditor negotiates the check. *Denver Elec. & Neon Corp. v Phipps, Inc.*, 354 P.2d 618, 623 (Colo. 1960); *see also Nguyen v. Calhoun*, 129 Cal. Rptr .2d 436 (Cal. Ct. App. 2003) (in general, the deposit of a payment check in the mail does not constitute payment; debtor assumes the risk that the deposited payment will be delivered and received by the creditor). If a householder attempts to pay the electric bill by mailing a check, he continues to be liable if the check is delayed or lost.

This presumption may be rebutted by evidence demonstrating a specific course of dealing or express agreement to the contrary. *See Werne v. Brown*, 955 P.2d 1053 (Colo. Ct. App. 1998). VALIC argues, in effect, that the Form executed by Mrs. Bass constituted an express agreement that its obligations to Mrs. Bass would be satisfied by mailing the check to her broker, even if the check was never delivered. We do not read the Form that way. Contracts are presumed to be

-13-

drafted with reference to existing principles of law, and in general, intent to modify applicable law by contract is effective only where expressly stated. *See* 11 *Williston on Contracts* § 30:19 (4th ed. 1997). To be sure, the contract contains mailing instructions, and thus authorizes VALIC to use the mails for the fund transfer. But nothing on the Form suggests any intention to shift the risk of misdelivery from VALIC to Mrs. Bass, or suggests that VALIC's debt was satisfied upon the act of mailing the check. Thus, even if VALIC is correct that the Form itself imposed only the obligation to "send," and not to "deliver," the check, we do not believe that VALIC's duty to repay Mrs. Bass on demand was thereby exhausted.

We would come to the same conclusion even if we were to assume that VALIC's duties as debtor were fully subsumed within the four corners of the Form. It is undisputed that, at a minimum, VALIC was contractually obliged to send the check to Mrs. Bass's brokers. VALIC submitted evidence that in the ordinary course of its business, checks are generally placed in a lockbox where another company, Lonestar, picks up the checks, seals them in envelopes, stamps and addresses them, and then delivers the checks to the postal service. Because Lonestar maintains no record of the number of checks taken from the lockbox, however, there is no way to determine whether all the checks deposited by VALIC were in fact processed by Lonestar. Thus, VALIC can offer no conclusive

-14-

evidence that Check I was placed in the box, or even if it was, that Lonestar successfully prepared it for mailing and delivered it to the postal service. For these reasons, VALIC is not entitled to any of the favorable legal presumptions that attach when an item is placed in the mails. *See Campbell v. IBM Corp.*, 867 P.2d 77, 80 (Colo. Ct. App. 1993) ("[W]hen the evidence is conflicting as to whether the letter was mailed initially, the presumption does not arise and the conflict must be resolved by the trier of fact."); *Witt v. Roadway Express*, 136 F.3d 1424, 1429-30 (10th Cir. 1998) (properly addressed piece of mail creates a rebuttable presumption of receipt only when "placed in the care of the postal service").

Dean Witter, on the other hand, submitted evidence that its Houston office has no record of processing Check I, though such a record would be kept in the ordinary course of its business. Dean Witter further submitted the affidavits of the Callenders, the securities brokers in the Houston office. Each deponent affirmed that he or she did not receive Check I. Further, in response to VALIC's motion for summary judgment, Dean Witter submitted affidavits from Ginny Holliday, the Houston branch manager, Richard Gilmore, the mail clerk, and Lourdes Capulin, the funds-received clerk.[2] Like the Callenders, these employees all denied receipt

---

[2] On appeal, as before the district court, VALIC raises a variety of arguments contending that the affidavits of Ms. Holliday, Mr. Gilmore and Ms.

(continued...)

-15-

of the check. Specifically, Mr. Gilmore and Ms. Capulin, the two employees responsible for physically handling the incoming checks, each issued a sworn statement that they did not: (i) process Check I, (ii) maintain it in their personal possession, or (iii) remove it from the Houston office. Based on the absence of any records for Check I, Ms. Holliday averred that "I know that the Houston Office never received" Check I. These affidavits thus support an inference that Dean Witter did not receive Check I at its Houston office.

Undisputed evidence thus supports the conclusion that VALIC prepared the check for mailing, but that it disappeared before being processed by Dean Witter in Houston. We simply do not know when or where, in between these two points, the check was stolen. Nothing in the record dispels the possibility that the check was taken before it reached the hands of the postal service. A jury might well infer from evidence of VALIC's practices that VALIC properly "mailed" the check, but this is only an inference. On a motion for summary judgment, all

---

[2](...continued)
Capulin should be ignored by the Court for failure to comply with certain of the Federal Rules of Civil Procedure. The district court did not rule on these claims, nor does its opinion indicate whether it accepted the affidavits. In any event, our reversal on this issue does not rely solely on the admissibility of these depositions. Even assuming the affidavits are not properly before the Court, we find VALIC's inability to demonstrate that it mailed the checks combined with the depositions of the Callender family (the admissibility of which is not contested) sufficiently create an issue of fact for the jury. *See Campbell*, 867 P.2d at 80; *Witt*, 136 F.3d at 1429-30.

reasonable inferences must be drawn in favor of Dean Witter, the party opposed to the motion.

We therefore reverse the district court's grant of summary judgment in favor of VALIC on the contractual claim.

### III.   Fraud and Promissory Estoppel Claims

The gravamen of Dean Witter's fraud and promissory estoppel claims is that for almost two weeks after November 2, 1998, VALIC repeatedly and falsely informed Mrs. Bass that it was in the process of stopping payment on Check I and would reissue a replacement check to her, when in fact it did not do so until November 16, when it was too late.  Evidence was submitted that as late as November 12, Kathleen Rutherford, a VALIC customer service employee, informed Mrs. Bass that the stop payment request on Check I would be taken care of – even though the thief had already cashed Check I and it had cleared VALIC's bank no later than November 10.  These dates take on particular significance because the thief did not begin depleting the fraudulent account until November 24.  Dean Witter alleges that had VALIC provided accurate responses to Mrs. Bass and Dean Witter during early to mid-November, the theft could have been prevented.  The promissory estoppel claim similarly asserts that Mrs. Bass relied on VALIC's assurances and reassurances that the check would be stopped and did not further pursue the missing check until it was negotiated and the thief began to

-17-

deplete the account.

The district court dismissed the fraud claim, stating: "Mrs. Bass's reliance on VALIC overlooks Dean Witter's role in permitting the loss to occur," and that "Dean Witter's conduct must be considered in determining the viability of the claim." Op. 4-5. Similarly, in dismissing the promissory estoppel claim the district court held:

> Plaintiff's argument that the loss was caused by Mrs. Bass's detrimental reliance on VALIC overlooks Dean Witter's own conduct. Dean Witter accepted Check I from an imposter, endorsed the check, and deposited it [in] a fraudulent account. As set forth above, Dean Witter was in a superior position to have prevented the loss, and any reliance by Mrs. Bass on VALIC's representations was not the cause of the loss.

Op. 8.

We do not disagree that Dean Witter's role in the affair must ultimately be taken into account, but we cannot agree with the district court that this justified summary judgment in favor of VALIC on the fraud and promissory estoppel claims. Dean Witter sues in its capacity as Mrs. Bass's assignee. The common law has long maintained that an assignee stands in the shoes of the assignor. *See Tivoli Ventures, Inc. v. Bumann*, 870 P.2d 1244, 1248 (Colo. 1994); 2 W. Blackstone, *Commentaries on the Laws of England* 327 (1769) ("[I]n assignments [the assignor] parts with the whole property, and the assignee stands to all intents and purposes in the place of the assignor."). Thus, when Dean Witter brings a

claim as an assignee of Mrs. Bass, the law conceptualizes the matter as if Mrs. Bass, not Dean Witter, stands before the court. Dean Witter's own role in the affair no more vitiates its legal claim in its capacity as assignee than its conduct would vitiate Mrs. Bass's claim if she had brought it herself.

To the extent that the district court's ruling was based on its judgment that "Dean Witter was in a superior position to have prevented the loss," such a finding oversteps the role of the court on motion for summary judgment. Both parties submitted evidence tending to show that the other party was the primary cause of the loss, and the weighing of this conflicting evidence is in the province of the jury.

To the extent that assignment has roots in equity, it might be argued (though VALIC has not raised the point in these terms) that the equitable doctrine of "clean hands" would preclude Dean Witter from proceeding against VALIC (on the factual assumption Dean Witter was to some extent responsible for the loss). *See, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (equitable maxim that "he who comes into equity must come with clean hands" vests court with discretion to close "the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant"). However, since the later part of the nineteenth century, courts have tended to view

written executions of assignment as legal acts devoid of the attending equitable considerations. *See, e.g., Cochran v. Stewart*, 21 Minn. 435 (1875) (notes of indebtedness are assignable without attending equitable defenses). One court has explained that while the "root of all subrogation lies in equity, the doctrine's modern day off-spring, which is the basis for the instant action, is statutory and contractual in nature. . . . [T]he general business conduct of the plaintiff subrogee is irrelevant to a determination of whether the subrogee can recover for the insured loss suffered by the subrogor." *Florists' Mut. Ins. Co. v. Ludvig Svensson, Inc.*, Civ. No. 301CV00095, 2003 WL 1856552 at *8 (W.D. Va. Apr. 9, 2003). In keeping with this trend, the Colorado Court of Appeals has held:

> Assignment is distinguished from subrogation in that subrogation is an act of the law predicated on payment of the debt or claim, and operates only to secure contribution and indemnity, whereas assignment is an act of the parties depending generally on intention, and contemplates a continuation of and transfers the whole claim or debt.

*Kirkham v. Hickerson Bros. Truck Co.*, 485 P.2d 513, 516 (Colo. Ct. App. 1971), quoting 6 C.J.S. *Assignments* § 2(b)12 (now reclassified as 6A C.J.S. *Assignments* § 5)) (*cited with approval* in *Eckhardt v. Village Inn*, 826 P.2d 855, 860 (Colo. 1992). Here, it is undisputed that Mrs. Bass, for valid consideration, contractually assigned her claims to Dean Witter. It follows that she transferred "the whole claim or debt," unaffected by the deeds or omissions of her assignee.

The conduct of Dean Witter in its corporate capacity would not have

precluded Mrs. Bass from suing VALIC if she had not assigned the claim. It therefore does not preclude her assignee from bringing the same claim. If Dean Witter's conduct contributed to the loss, as VALIC claims and the district court concluded, the proper course is for VALIC to bring some sort of claim against Dean Witter for indemnification or contribution. According to counsel's representations at oral argument, Dean Witter's conduct was brought before the district court pursuant to C.R.S. § 13-21-111.5. This statute provides a procedural mechanism whereby negligence or fault may be attributed to non-parties, thus relieving a party-defendant from the portion of liability attributed to the non-party. It is through this, or some similar procedural mechanism, rather than summary judgment against Dean Witter, that Dean Witter's own contribution to the loss, if any, should be assessed.

In addition to dismissing the case on the basis of Dean Witter's conduct, the district court also rejected the promissory estoppel claim, at least in part, on its finding that "it would . . . be speculative to conclude that VALIC could have stopped payment before Check I was cashed by Dean Witter on November 9, 1998." Op. 8. We believe that such "speculation" is within the province of the jury; only by indulging inferences in favor of the party moving for summary judgment could the possibility that VALIC could have stopped payment on a check in time be dismissed. Moreover, Dean Witter presented evidence that damages

could have been prevented if the fraudulent account had been frozen before the depletion started on November 24, 1998: Mrs. Bass's reliance on VALIC's false reassurances prevented her from further investigating the whereabouts of her check and discovering that it had been negotiated by Dean Witter in Los Angeles. Based on the evidence of Mrs. Bass's diligence in determining the whereabouts of her check, a reasonable jury *could* conclude that the theft would have been prevented.

### IV.    Colorado Consumer Protection Act

Dean Witter's claim under the Colorado Consumer Protection Act restates its common-law fraud claim with one significant addition: that the misrepresentations made to Mrs. Bass were part of a pervasive pattern throughout VALIC's customer service department of misinforming customers regarding the status of their accounts. In support of these allegations, Plaintiff submitted testimony from Ms. Marlene Jorgensen, a former VALIC customer service representative. According to Ms. Jorgensen, VALIC instructed her to inform customers that their requests would be processed within five to seven days, whether or not this was true. Rather than following through and solving problems, Ms. Jorgensen declared that VALIC employees were trained to give "pat" and "cookie-cutter" answers designed to summarily dispose of customer's questions and complaints, but which ultimately proved misleading to the customers. *See*

App. at 271-74.

Under Colorado law a plaintiff can maintain a private right of action under the CCPA if it can demonstrate:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998).

The district court found that Dean Witter failed to demonstrate how VALIC's alleged wrongdoing significantly affected the public, as required by *Hall*'s third factor. In granting VALIC summary judgement on the CCPA claim, the district court reasoned:

> There is no evidence that VALIC's allegedly wrongful conduct in the handling of Mrs. Bass's accounts had any impact on other customers or potential customers of VALIC's services. Although Ms. Jorgensen's testimony suggests that Mrs. Bass's difficult experience with the VALIC customer service department was not an isolated occurrence, this evidence does not demonstrate the kind of public impact necessary to show a violation of the CCPA. *See Martinez*, 969 P.2d at 222-23.

Op. 7.

The district court correctly summarized the relevant legal principles set forth by the Colorado Supreme Court. However, considering the record in the light most favorable to the party opposing summary judgment, we cannot agree

-23-

with its prediction that the Colorado courts would bar a private right of action under the CCPA. This is a legal issue we review *de novo*. *See Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991) (interpretations of state law by federal district judges sitting in the forum state are not entitled to deference by the courts of appeal); *see also Steiner Corp. v. Johnson & Higgins*, 135 F.3d 684, 690 (10th Cir. 1998).

In analyzing the third *Hall* factor, Colorado courts look to several further indicia to determine whether a challenged practice has significant impact on the public. These include: (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers; and (3) evidence that the challenged practice has previously impacted other consumers or has significant potential to do so in the future. *Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998).

This case admittedly presents a close question as to whether the harm allegedly experienced by Mrs. Bass is the type of public harm covered by the CCPA. On the one hand, the CCPA is to be liberally construed to effect its remedial purpose, *Hall*, 969 P.2d at 230; on the other, "[i]f a wrong is private in nature, and does not affect the public, [the] claim is not actionable under the CCPA." *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining*, 62 P.3d 142, 149 (Colo. 2003). In *Full Draw Productions v. Easton Sports, Inc.*, 85 F.

Supp. 2d 1001, 1007 (D. Colo. 2000), the District of Colorado elegantly

summarized the considerations relevant to *Hall*'s third prong as follows:

> *Hall* and *Martinez*, companion cases recently decided by the Supreme Court of Colorado, provide the two most important guideposts for determining whether Full Draw's alleged conduct had a sufficient impact on the public as consumers to be the subject of a private suit under the CCPA. *Hall* involved a suit against real estate developers who marketed residential lots under the false pretense that lot owners would have a right-of-way across a piece of land owned by the plaintiff. 969 P.2d at 227. "[B]ecause the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers", the statements significantly impacted the public as consumers. *Id*. at 235.
>
> The opposite result was reached in *Martinez*. There, the plaintiff brought suit under the CCPA against a doctor retained by State Farm Mutual Automobile Insurance Company to perform independent medical evaluations. 969 P.2d at 215. The doctor's medical conclusion that plaintiff was "malingering" led to denial of the plaintiff's insurance claim. *Martinez*, 969 P.2d at 215. The plaintiff argued that the doctor committed a deceptive trade practice by falsely representing to State Farm that he was capable of diagnosing organic brain injury when, in fact, he was not qualified to do so. *Id.* at 220-21. Because the deception was committed against only one person, State Farm, and because the deceived party was a large, sophisticated insurance company rather than a vulnerable individual consumer, the plaintiff could not establish that the deceptive practice significantly impacted the public as consumers. *Id*. at 222.

We take further guidance from *Rhino*, which the Colorado Supreme Court

decided after the district court decision in this case. *Rhino* involved claims by

-25-

Snyder, a distributor, against its supplier, Rhino, and a third-party distributor for breach of contract and tortious interference with the exclusivity provisions of Snyder's contract with Rhino. 62 P.3d at 144-45. In addition to its common law claims, Snyder asserted CCPA claims against both defendants. In holding that Snyder could not maintain an action under the CCPA, the court noted that: (1) the alleged fraud did not have significant public impact since it affected, at most, several distributors and not the general public; (2) Snyder was represented by legal counsel and was knowledgeable about the industry; (3) *Rhino*'s alleged misrepresentations were limited to potential distributors rather than the general public; and (4) the alleged misrepresentations made privately to Snyder were distinguishable from the advertisements addressed to the general public at issue in *Hall*. *Id.* at 150.

Reviewing *Hall*, *Martinez*, and *Rhino* leads us to conclude that a Colorado court would find Dean Witter to have presented sufficient evidence to survive summary judgment on its CCPA claim. The issue before us is not whether another VALIC customer is likely to be subjected to the lost check fiasco endured by Mrs. Bass, but rather whether similarly situated customers will be subjected to misleading information in the future. The allegedly misleading information seems to have been supplied by the customer service center responsible for servicing account information inquiries from the general public. VALIC manages over two

million "participant accounts." App. 327. In just one four-state region, VALIC processes over 600 transfer requests per month, and assuming the truth of Ms. Jorgensen's statements for purposes of summary judgment, the misinformation disseminated by the customer service department could potentially affect large numbers of VALIC customers. Many of VALIC's customers lack significant financial expertise, particularly as contrasted with the resources at VALIC's disposal, and they are unlikely to be represented by counsel in their day-to-day dealings with VALIC.

To be sure, Dean Witter is a long way from proving the truth of Ms. Jorgensen's allegations. The testimony of one former employee may not be sufficient to implicate an entire organization in a persistent pattern and practice of misinforming its clients. Moreover, on remand, VALIC may challenge any of the factual assumptions made by the Court in analyzing the relative sophistication and bargaining power of VALIC *vis-a-vis* its customers. At this point, however, we are at the summary judgement stage, and thus decide all facts and draw all inferences in favor of Dean Witter. *Jones v. Barnhart*, 349 F.3d 1260, 1265 (10th Cir. 2003). "[O]ur role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain [a] claim." *Id.*; *Foster v. Allied Signal*, 293 F.3d 1187, 1194-95 (10th Cir. 2002) (federal court sitting in diversity applies federal summary judgment standards).

-27-

We find that it is.

## V.  Breach of Fiduciary Duty

Finally, Dean Witter alleges that because VALIC failed to ensure the safe delivery of the checks to the requested address, VALIC was in breach of its fiduciary duty to Mrs. Bass.  The district court dismissed this claim, finding that no fiduciary relationship existed between Mrs. Bass and VALIC, and that there can be no breach of fiduciary duty unless the duty is first established.  *See Moses v. Diocese of Colorado*, 863 P.2d 310, 320 (Colo. 1993).   We agree.

In *Paine, Webber, Jackson, & Curtis, Inc. v. Adams*, 718 P.2d 508 (Colo. 1986), the Colorado Supreme Court held that a stockbroker/customer relationship is not "*per se*, fiduciary in nature." *Id.* at 517.  Rather, the court looked to the circumstances defining the relationship between the broker and the client.  Relying on *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 461 F. Supp. 951 (E.D. Mich. 1978), the Colorado Supreme Court contrasted cases in which the broker makes investment decisions, acts as an advisor to the clients, and initiates trades in the account without a client's approval or notice (in which a fiduciary relationship was said to exist), with cases in which the broker merely facilitates the transactions requested by the client, provides limited financial or managerial advice, and maintains no discretion regarding the composition of the client's portfolio.  In the latter cases, no fiduciary relationship was found.  *See Paine*

-28-

*Webber*, 718 P.2d at 515-18; *Leib*, 461 F. Supp. at 953-55.

Colorado courts have similarly held that, absent a showing of special circumstances, a lending institution will not be considered the fiduciary of its customers. *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1365 (Colo. Ct. App. 1994). *Wells Fargo* contrasted the typical banking arrangement with cases where "there is a repose of trust by the customer along with an acceptance or invitation of such trust on the part of the lending institution." *Id.* (internal citations and quotations omitted). Quoting the Montana Supreme Court, *Wells Fargo* concluded that:

> [A] fiduciary relationship [between bank and lender] may result from the development of a special relationship akin to an advisor/advisee. This special relationship must exist before a fiduciary duty arises.
> . . . .
> [N]o fiduciary duty arises between a bank and its borrower where the bank did not offer financial advice, its advice was not always heeded, or where the borrower was advised by others, such as legal counsel.

*Id.* (quoting *Simmons Oil Corp. v. Holly Corp.*, 852 P.2d 523, 526 (Mont. 1993) (brackets and ellipses in original; emphasis removed); *see also ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 662 N.Y.S.2d 190, 192 (N.Y. Sup. Ct. 1997) (under New York law, normal commercial relationship between bank and client does not constitute fiduciary relationship).

Based on these principles, we affirm the district court's finding that VALIC

was not Mrs. Bass's fiduciary. VALIC was not authorized to unilaterally sell or purchase any securities or investments on behalf of Mrs. Bass, nor did it control her investment decisions. Mrs. Bass met with VALIC representatives for only about half an hour each year and did not receive significant investment advice from her broker. *Id.* We further reject Dean Witter's argument that VALIC's undertaking to deliver the monies to the Houston office created a fiduciary relationship. This action is devoid of any of the criteria used by Colorado courts to determine fiduciary status, and quite to the contrary, shows that VALIC's distribution of the funds occurred only pursuant to Mrs. Bass's written instructions. Our review of Colorado law leads us to believe that no reasonable jury could find VALIC Mrs. Bass's fiduciary.

## VI.     Conclusion

Based on the analysis presented above, we REVERSE the district court as to the contract, fraud, promissory estoppel, and CCPA claims, and REMAND these claims for further consideration. With regard to the bailment and fiduciary claims, the opinion of the district court is AFFIRMED.